## LITTLE ROCK CONVENTION AND VISITORS BUREAU *v.* David PACK

CA 97-698                                   959 S.W.2d 415

Court of Appeals of Arkansas
Division III
Opinion delivered December 22, 1997

*Dover & Dixon, P.A.*, by: *Joseph H. Purvis*, for appellant.

*Dabbs, Graham & Pomtree*, by: *Jeffrey M. Graham*, for appellee.

ANDREE LAYTON ROAF, Judge. The Little Rock Convention and Visitors Bureau (employer) appeals from a Workers' Compensation Commission decision finding that the appellee, David Pack, suffered a compensable unexplained fall. Pack, who suffered brain damage as a result of the fall and is permanently and totally disabled, cross-appeals from the denial of benefits for nursing services provided by his mother. On appeal, the employer contends that the Commission erred in finding that Pack proved that his condition resulted from an injury that arose out of and in the course of his employment. Pack contends on cross-appeal that the denial of benefits for nursing services is not supported by substantial evidence. We affirm on both the appeal and the cross-appeal.

David Pack, aged thirty-eight, was employed by the appellant as a maintenance worker. On April 16, 1991, he was working

alone, applying caulk to a concrete walkway outside Robinson Auditorium. A co-worker, Tim Gosser, testified that he observed Pack bent over, squatting or on his hands and knees while he was caulking, and that he spoke to Pack and he seemed fine. However, when Gosser returned to where Pack was working about twenty minutes later, he found Pack lying on the ground on his stomach, with his head turned to the right. Pack was barely breathing and was beginning to turn blue. Gosser called Pack's supervisor, who turned Pack over onto his back and called for an ambulance.

Paramedics arrived and performed a "jaw thrust" to open up Pack's airway. The paramedic stated that Pack was attempting to breathe, but was not moving any air. A small abrasion to Pack's forehead was the only sign of trauma noted. The paramedic testified that he did not observe evidence of seizures at the scene of the accident or on the way to the hospital. He testified that although he noted copious saliva, which can be present with seizures, he did not feel that Pack had suffered a seizure because there was no evidence of incontinence, blood in Pack's saliva, or abrasions on his head and hands from thrashing about. While in route to the hospital, Pack was administered oxygen and began to regain color and his blood pressure returned to a more normal rate. After Pack reached the UAMS Emergency Room, he experienced several grand mal seizures. He remained at UAMS for six days and was then transferred to Baptist Memorial Hospital where he remained for nearly one month. After his release from the hospital, Pack underwent a month of rehabilitation at Baptist Rehabilitation Institute. His mother cared for him at home until he was enrolled in the Timber Ridge Neurorehabilitation Program for one month in 1993. His mother then resumed his care and continues to care for him. The parties stipulated that Pack suffered brain damage and that he is permanently and totally disabled.

At the hearing, Gosser, Pack's co-worker, testified that he was not aware that Pack had any health problems or problems with drugs or alcohol. Gosser also stated that he did not see any foreign objects near Pack which he might have choked on. Bill Patten, Pack's supervisor, testified that Pack did not have any alcohol or health problems that he knew of, although he thought he had

smelled alcohol on him before the date of the accident. Patten also noted that Pack had missed several days of work due to illness just prior to the accident.

Ruth Siratt, Pack's mother, testified that Pack was divorced and had lived with her for several years prior to his accident. She testified that he had no health problems other than seasonal allergies. Siratt denied that Pack had a drinking problem and testified that she did not know how a reference to an alcohol problem got into Pack's medical records. Siratt testified about Pack's care and transfer among the hospitals and to the rehabilitation institutes. She testified that she had to toilet train Pack after the injury and that it took about four to six months. She testified that she still washes Pack's hair and that she has to help him shave. She stated that he can be left alone for periods of time, but that doctors have indicated that if he is in a cold room, he will not turn on the heat, or that if the room becomes hot, he will not turn on the air conditioning. She testified that she has to give Pack verbal cues to attend to his personal hygiene because he lacks the initiative to do it himself.

Dr. Edward Barron, who first examined Pack on July 30, 1992, testified as to the most probable sequence of events leading to Pack's injury. Based on his review of the medical records, Dr. Barron theorized that when Pack stood up after kneeling or bending over for a period of time, he had a "vaso-vagal syncope" (fainted), fell to the ground, struck his forehead, and was knocked unconscious. Dr. Barron stated that Pack's airway was obstructed because of the positioning of his head, and that Pack developed hypoxic encephalopathy (lack of oxygen to the brain), resulting in permanent brain damage. He stated that the seizure activity observed after Pack reached the hospital was secondary to the hypoxic encephalopathy.

Pack's mother, now his legal guardian, filed a claim for workers' compensation benefits. She also sought an award for nursing services for his continuing care. The Commission found that Pack suffered an "unexplained fall," and that he was, therefore, entitled to benefits. The Commission, however, denied the claim for "nursing services."

### 1. *Unexplained Fall*

■ ■ The employer argues that there was insufficient evidence to prove that Pack's injuries "arose out of and in the course of his employment," and that Pack suffered a noncompensable "idiopathic" fall, rather than a compensable "unexplained" fall. In determining the sufficiency of the evidence to sustain the findings of the Workers' Compensation Commission, we review the evidence in the light most favorable to the Commission's findings and affirm if they are supported by substantial evidence. *Weldon v. Pierce Bros. Constr.*, 54 Ark. App. 344, 925 S.W.2d 179 (1996). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *City of Fort Smith v. Brooks*, 40 Ark. App. 120, 842 S.W.2d 463 (1992). The question is not whether the evidence would have supported findings contrary to the ones made by the Commission; there may be substantial evidence to support the Commission's decision even though we might have reached a different conclusion if we sat as the trier of fact or heard the case *de novo*. *Tyson Foods, Inc. v. Disheroon*, 26 Ark. App. 145, 761 S.W.2d 617 (1988). In making our review, we recognize that it is the function of the Commission to determine the credibility of the witnesses and the weight to be given their testimony. *Whaley v. Hardee's*, 51 Ark. App. 166, 912 S.W.2d 14 (1995). The Commission has the duty of weighing medical evidence and, if the evidence is conflicting, its resolution is a question of fact for the Commission. *Id.*

■ The Commission noted that, in order to be compensable, an injury must be found to arise out of and in the course of a claimant's employment. However, Arkansas courts have said that where a claimant suffers an "unexplained injury" at work, it is compensable. In contrast, when a claimant suffers an "idiopathic injury," it is not compensable because such an injury is considered personal in origin and would not, therefore, arise out of and in the course of the employment. This court explained the distinction in *Moore v. Darling Store Fixtures*, 22 Ark. App. 21, 732 S.W.2d 496 (1987):

> When one suffers an injury at work, the cause is, obviously, either known or unknown. Larson's treatise on workers' com-

pensation law states that the most common example of a situation in which the cause of the harm is unknown is the unexplained fall in the course of employment and that most courts confronted with that situation have seen fit to award compensation. However, injuries from idiopathic falls do not arise out of the employment unless the employment contributes to the risk or aggravates the injury by, for example, placing the employee in a position which increases the dangerous effect of the fall, such as on a height, near machinery or sharp corners, or in a moving vehicle.

The word "idiopathic" is defined in Webster's Third New International Dictionary, Unabridged (1976), as (1) peculiar to the individual, (2) arising spontaneously or from an obscure or unknown cause. Although the two concepts are frequently confused, Larson says "unexplained fall cases begin with a completely neutral origin of the mishap, while idiopathic fall cases begin with an origin which is admittedly personal and which therefore requires some affirmative employment contribution to offset the prima facie showing of personal origin." (Citations omitted.)

*Moore*, 22 Ark. App. at 25, 732 S.W.2d at 498.

■ The court further noted that a workers' compensation claimant bears the burden of proving that his injury was the result of an accident that arose in the course of his employment, and that it grew out of, or resulted from the employment. *Id.* at 27, 732 S.W.2d at 499. "Arising out of the employment" refers to the origin or cause of the accident, while "in the course of the employment" refers to the time, place and circumstances under which the injury occurred. *Id.* (citing *Owens v. National Health Lab., Inc.*, 8 Ark. App. 92, 97 S.W.2d 829 (1983)). When a truly unexplained fall occurs while the employee is on the job and performing the duties of his employment, the injury resulting therefrom is compensable. *Id.*

In the present case, the Commission found that Pack suffered an "unexplained fall" based on the following facts: (1) the co-worker who last saw Pack conscious testified there was nothing abnormal about Pack's condition, and about twenty minutes passed between the time he last saw Pack and when he found him unconscious; (2) the paramedic testified that he did not see a foreign object at the scene (something Pack might have choked on) and about the lack of evidence that Pack had suffered a seizure

when he fell; (3) Pack's post-injury alcohol and drug screens were negative and there was no record of prior seizures or abnormalities; (4) Pack's discharge summary stated that the cause of his injury was unknown, and the doctors who treated Pack after his injury only theorized that Pack could have had a seizure which caused his airway to be blocked or that his subsequent seizures in the emergency room could have been caused by having his airway blocked; and (5) medical testimony revealed that, had Pack's injury been alcohol-related, there would have been alcohol in his system. There was also no evidence that chronic alcohol abuse would increase the risk of seizures.

■ The employer argues that there was evidence that Pack drank a six-pack of beer daily prior to his injury, and suggests that alcohol abuse could have led to his injury. The employer also argues that, even if the Commission accepted Dr. Barron's scenario as to how Pack's injury occurred, it should still be found to be an "idiopathic injury" because it may have happened due to Pack's weakened condition because of illness. The employer further argues that because what Pack was doing, applying caulk, was "hardly a risky task," his idiopathic injury is not compensable. However, these arguments are based merely upon speculation as to how Pack's injury might have occurred. The Commission, in its summary of the facts, medical records, and testimony, concluded that there was no evidence that a condition personal to Pack caused his injury. Upon our review of the record, we cannot say that there is not substantial evidence to support the Commission's finding that Pack suffered a compensable unexplained fall.

## 2. Nursing Services

On cross-appeal, Pack argues that the decision to deny benefits for nursing services is not supported by substantial evidence. He argues that he needs twenty-four hour supervision, cannot care for himself, and cannot participate in out-of-home programs, such as Easter Seals, because he is too old and because his mother's 5:00 a.m. to 1:00 p.m. work schedule does not allow her to be present to prepare him to be picked up in the mornings. Pack contends that even though his physical limitations are minimal, his

mental limitations are great, and he would need to be in a nursing home if his mother did not care for him.

While it is true that doctors have indicated that Pack is incapable of living alone and taking care of himself, his mother described the tasks she must perform for him as primarily giving him "verbal cues." Although Pack can bathe himself, dress himself, and perform other personal tasks, his mother testified that he is not likely to initiate those tasks without being told to do so. Pack's mother testified that while she sometimes has to help him finish shaving and tell him what clothes to put on, he can do those things himself. There was no evidence that Pack needs constant supervision or that he cannot be left alone. In fact, Pack's mother works at a nursing home in the mornings and Pack is left alone until 1:00 p.m. The Commission also noted that Pack was enrolled in a computer training class during the time his mother claimed he was incontinent.

■ The supreme court has said that the services contemplated under "nursing services" are those rendered in tending or ministering to another in sickness or infirmity. *Pickens-Bond Constr. Co. v. Case*, 266 Ark. 323, 584 S.W.2d 21 (1979). Nursing services do not include assistance with household and personal tasks which the claimant is unable to perform. *Pine Bluff Parks & Recreation v. Porter*, 6 Ark. App. 154, 639 S.W.2d 363 (1982); *Pickens-Bond Constr. Co.*, *supra*. Benefits for nursing services have been allowed where the services consisted of medical care, including changing bandages and cleaning a wound, (*Tibbs v. Dixie Bearings, Inc.*, 9 Ark. App. 150, 654 S.W.2d 588 (1983)), giving injections, enemas and hot baths, (*Dresser Minerals v. Hunt*, 262 Ark. 280, 556 S.W.2d 138 (1977)), physical therapy, (*Wasson v. Losey*, 11 Ark. App. 302, 669 S.W.2d 516 (1984)), and where the claimant was mentally and physically helpless with no control over his bodily functions and needed twenty-four hour per day care (*Sisk v. Philpot*, 244 Ark. 79, 423 S.W.2d 871 (1968)). However, nursing services were not allowed where the claimant needed supervision because he was depressed and suicidal. *J.P. Price Lumber Co. v. Adams*, 258 Ark. 631, 527 S.W.2d 932 (1975).

■ In Pack's case, his doctors noted that he needed encouragement to do such personal things as caring for himself. Moreover, according to Pack's mother, she only assists him in his daily tasks and housekeeping, and does not provide any medical care to Pack. Based on the relevant case law and on Pack's mother's testimony regarding the type of care she provided to her son, we cannot say that there is not substantial evidence to support the denial of benefits for nursing services.

Affirmed.

ROBBINS, C.J., and MEADS, J., agree.