***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence and having reviewed the competent evidence of record, the Full Commission hereby modifies the Opinion and Award as expressed below.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement, which was admitted into the record at the deputy commissioner hearing, and marked as Stipulated Exhibit (1) as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee, and defendant-employer at all times relevant hereto.
3. Travelers Insurance Company was the carrier on the risk at the time of the 28 April 1983 injury by accident.
4. On 28 April 1983, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer.
5. An Industrial Commission Form 21 Agreement for Compensation for Disability was approved by the Commission on 31 May 1983.
6. Plaintiff's average weekly wage on 28 April 1983 was $330.00, yielding a compensation rate of $220.00.
7. As of 14 January 2002, indemnity compensation in the amount of $214,635.11, and medical expenses in the amount of $94,163.02 have been paid by defendants.
8. At the hearing, the parties submitted the following:
 a. A Packet of "Plaintiff's Exhibits", which was admitted into the record, and marked as Stipulated Exhibit (2);
 b. A Notebook of Medical Records, which was admitted into the record, and marked as Stipulated Exhibit (3);
 c. Discovery Responses, which were admitted into the record, and marked collectively as Stipulated Exhibit (4), and;
 d. A Life Care Plan, which was admitted into the record, and marked as Stipulated Exhibit (5).
9. The issues to be determined are as follows:
 a. To what, if any, attendant care reimbursement is plaintiff entitled to recover for attendant care services provided in the past;
 b. To what, if any, attendant care reimbursement is plaintiff entitled to recover for attendant care services to be provided in the future;
 c. Whether plaintiff's claim for attendant care services is causally related to his injury by accident, or the result of unrelated conditions;
 d. Whether defendants have sufficient information to determine the need for, basis for, reasonable necessity for, and relationship to the compensable claim with regard to attendant care services;
 e. Whether plaintiff's claim is barred because it was not included in the previously approved Form 21;
 f. Whether plaintiff's claim for attendant care services is barred by G.S. § 97-22, or G.S. § 97-24;
 g. Whether plaintiff's claim for attendant care services is barred the doctrine of laches;
 h. To what, if any, other items contained in the Life Care Plan (Stipulated Exhibit (5)), is plaintiff entitled to be reimbursed by defendants;
i. To what medical compensation is plaintiff entitled;
 j. Whether plaintiff complied with G.S. § 97-25 and G.S. § 97-2(9) in providing notice to defendants of his need for medical services;
 k. Whether or not plaintiff sought prior approval for attendant care services he is now seeking, and whether defendants were denied their right to direct and control medical treatment;
 l. Whether plaintiff is entitled to a payment penalty to be paid by defendants for late payment of medical expenses;
 m. Whether there are equitable waiver or constitutional issues involved, including a violation of due process and equal protection, and;
 n. Whether plaintiff is entitled to attorney's fees pursuant to G.S. § 97-88.1.
 ***********
Based upon the competent evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the deputy commissioner hearing, plaintiff was 71 years old, with his date of birth being 13 December 1930. On 28 April 1983, plaintiff sustained a severe head injury in an admittedly compensable injury by accident. Following this injury, plaintiff was hospitalized at Wake Medical Center from 28 April 1983 to 22 July 1983. During that period, Dr. Stephen Boone performed a craniotomy to remove skull fragments from plaintiff's brain.
2. Upon being discharged from the hospital in July 1983, it was medically necessary that plaintiff have attendant care services. On 19 September 1983, plaintiff was admitted to and treated at Southeastern Rehabilitation Center in Fayetteville. Following his course of rehabilitation, plaintiff was discharged on 21 October 1983. Once at home, plaintiff continued to require attendant care services. Subsequently, from 26 March 1984 to 6 April 1984, plaintiff was hospitalized for a cranioplasty procedure, in which a plastic plate was inserted into his skull.
3. As the result of his 28 April 1983 admittedly compensable injury, plaintiff has impaired judgment, impaired vision, severe hearing loss, and the inability to maintain his balance. Plaintiff's head injury has also resulted in a change in behavior. Prior to his head injury, plaintiff performed much of the needed work in and outside of his home. Since September 1999, plaintiff has displayed periodic destructive behavior regarding his home and yard. The skills and experience that made him productive prior to his head injury have since been used in an unpredictable pattern of destruction. Plaintiff's behavior in this regard has included the destruction of molding, bathroom tiling, and flooring inside his home. Outside his home, plaintiff has destroyed shrubbery, his yard grass, and the ground around much of his home's foundation. Plaintiff's destructive behavior outside the home has also resulted in damage to the property of neighbors, as was corroborated by the testimony of Ms. Tammy Jones.
4. As the result of his 28 April 1983 head injury and related conditions, plaintiff requires assistance with his balance, in preparing meals, with his financial affairs, and with the monitoring of his behavior.
5. At the time of his injury, plaintiff was estranged from his wife, Ernestine Leathers. At that time, Ernestine Leathers lived in New Jersey, and plaintiff lived at 8501 Ray Road, Raleigh, North Carolina with his daughter, Sherry Leathers.
6. After plaintiff's 28 April 1983 injury by accident, Ms. Ernestine Leathers returned to North Carolina and provided attendant care services for plaintiff. Ms. Ernestine Leathers received some compensation for these services. The evidence is insufficient upon which to make a finding regarding the amount received by Ms. Ernestine Leathers or the periods for which payments covered. Ms. Ernestine Leathers returned to New Jersey sometime in 1986.
7. In addition, an outside attendant care provider was hired and paid for by defendants. This person, named Patricia, provided some attendant care services for a limited period after plaintiff returned home following his discharge from the Southeastern Rehabilitation Center.
8. Plaintiff's daughter, Sherry Leathers, contends that she assumed the duty of providing the attendant care services for plaintiff at the family home located at 8501 Ray Road, Raleigh, North Carolina, after her mother left in 1986. Sherry Leathers was born in 1961, and was 25 years old when she contends that she began her role as being plaintiff's primary attendant care provider. From 1986, until the date she went to work for IBM in 1994, Sherry Leathers was not employed outside the home.
9. Upon going to work for IBM, Sherry Leathers worked approximately 8 hours per day. Sherry Leathers continued with this schedule until she was laid off in August of 2001. Thereafter, Sherry Leathers obtained employment at a staffing service in the Raleigh area.
10. From 1986 and until the time of the hearing in this case, Sherry Leathers has lived some of the time, but not all of the time, with plaintiff at 8501 Ray Road. She has also maintained a mailing address and spent time with a boyfriend at 2209 Stonehenge Drive, Apartment 3, in Raleigh. During an average week, Sherry Leathers asserted that she would spend approximately two nights with her boyfriend and five nights a week at the family home at 8501 Ray Road. Sherry Leathers also indicated that her relationship with this boyfriend ended in approximately September 2001 and asserted that she has lived with her father at the 8501 Ray Road address continuously, subject to an occasional vacation day or night out at a girlfriend's house. Contrary to Ms. Leathers' testimony, the greater weight of the evidence does not establish that Sherry Leathers lived at 8501 Ray Road and that she provided 24-hour care to her father. Ruth Yutzy, a registered nurse and certified case manager, visited plaintiff's one-story, two bedroom house in the course of determining plaintiff's need for attendant care. Ms. Yutzy reported that plaintiff lived in one bedroom and neither the other bedroom nor other portions of the house demonstrated the presence of a woman. The second bedroom was covered with Christmas items, despite the visit on January 10, 2002, and there were no feminine hygiene items present in the home consistent with Sherry Leather's presence. In addition, plaintiff's medical records indicated that, although Sherry Leathers often accompanied plaintiff to his medical appointments, she continued to report that plaintiff lived alone and that Sherry Leathers was not familiar with the medications that plaintiff was taking, or otherwise was not current on his medical treatment consistent with a person monitoring his medical care. Therefore, the Full Commission finds that the greater weight of the evidence fails to establish that Sherry Leathers was providing consistent and reliable attendant care to her father. Because of the inconsistency between Sherry Leathers' testimony and the findings of Ms. Yutzy and the statements in plaintiff's medical records, the Full Commission gives little weight to the testimony of Sherry Leathers. Further, because the medical records indicate that Sherry Leathers was not aware of plaintiff's medications and was not attentive to his medical care, the Full Commission finds that it is not in the best interest of plaintiff to allow his need for continued attendant care to be performed by his daughter, Sherry Leathers.
11. Although the medical records and other evidence establish that plaintiff was provided with attendant care, at the expense of defendants, by his wife and/or outside vendors from 1983 to 1986, the greater weight of the competent medical evidence fails to establish that any physician prescribed attendant medical care for plaintiff after this care ended in 1986 and prior to 1999.
12. Plaintiff's medical records indicate that he was living alone and able to take care of his needs prior to September 1999. In particular, in May 1985, Dr. Boone explained that plaintiff had "made an amazing recovery," was working around his house, in the garden and on his car. Dr. Boone reported that plaintiff was able to return to some form of employment and provided him with an application for a handicapped license plate for his vehicle. In 1986, Dr. Boone indicated that plaintiff was having some problems with stamina, but that he continued to work and drive. Plaintiff's records from Life Experiences, Inc., for the period from 1986 to 1988 indicated that on a 1 to 10 scale for independent living plaintiff was a 10 and that he was "very independent." Plaintiff was driving to work, eating out everyday, and was able to perform all of his required duties without assistance. In 1987, plaintiff was exhibiting appropriate behavior and competently performed the bakery duties with Life Experiences; however, plaintiff was higher functioning than others participating in the program and voluntarily left the program because of lack of interest. Dr. Boone's medical records through June 1997 reported that plaintiff was able to drive, at least during the daytime, and was capable in taking care of his daily affairs. Plaintiff did not see Dr. Boone from June 1997 until September 1999. Plaintiff's medical records do not indicate a need for attendant care from 1986 to September 1999.
13. Dr. Boone examined plaintiff on September 2, 1999, and reported a significant change in his behavior. Dr. Boone reports that plaintiff tore up his yard, dug up trees, and tore up the sidewalk. Plaintiff also was not coming in to eat after he left the house in the morning. Plaintiff was no longer driving, appeared to be slower than when last examined, and appeared to have a change in mood. Plaintiff had lost 30 to 40 pounds. Dr. Boone referred plaintiff for a mental health evaluation and scheduled plaintiff to be rechecked in two years. Dr. Boone did not prescribe attendant care at this time.
14. In January 2001, Dr. Boone had a conversation with plaintiff's daughter, Sherry Leathers, concerning attendant care for plaintiff. Dr. Boone characterized the conversation as centering on plaintiff's daughter's wish that her father not go to a nursing home. Sherry Leathers reported to Dr. Boone that the insurance company was not paying for all the bills that they should pay and that Dr. Boone would be contacted by Mr. Steve Carpenter "who works for Mr. Lore" and Donna Stephenson "who works for [T]ravelers insurance." Sherry Leathers testified that she asked Dr. Boone to cooperate with Mr. Carpenter and advised Dr. Boone to not speak with Ms. Stephenson. Dr. Boone expressed in his medical records that he did not want to be the mediator between these people.
15. Dr. Boone's records indicate that he was contacted by Donna Stephenson and Stephen Carpenter concerning the preparation of life care plans for plaintiff. From Dr. Boone's records, it is apparent that Dr. Boone initially was not cooperative with their respective requests; however, Mr. Lore, plaintiff's counsel, subsequently contacted Dr. Boone and met with Dr. Boone's secretary, after which time Dr. Boone met with Mr. Carpenter and assisted with the preparation of a life care plan for plaintiff.
16. Stephen D. Carpenter, M.Ed., CRC, CDMS, CCM, MES, prepared a life care plan that was approved by Dr. Boone in August 2001. Mr. Carpenter's proposed life care plan recommended attendant care beginning July 2001 and continuing through plaintiff's life. The purpose of the attendant care is:
 "[t]o assist the patient with transportation, cooking, cleaning, and other daily activities, appointments, and other necessary needs. In addition, the attendant will closely supervise the patient for prevention of inappropriate nighttime behavior."
Mr. Carpenter estimated that these services could be arranged for at a daily flat rate of $100.00 to $170.00 per day (based on a $10.00 to $15.00 per hour rate). Mr. Carpenter's life care plan included assisted living or nursing home care at rates less than the proposed expense for attendant care, but expressed that this care would be considered at an unknown date in the future when plaintiff exhibited a decline in cognitive capacity and severity.
17. Plaintiff received his mental health evaluation suggested by Dr. Boone on May 5, 2001, when he saw Fernando Ruiz, M.D., Staff Psychiatrist with Wake County Mental Health Services. Dr. Ruiz reported that plaintiff came to the examination with his daughter, Sherry Leathers. Significantly, Dr. Ruiz reported that plaintiff "has been living independently, and his daughter lives near by and provides assistance." Dr. Ruiz diagnosed plaintiff with a depressive disorder with mild to moderate dementia secondary to head trauma. Plaintiff was placed on medications and in a daily activity program at Total Life Center, which plaintiff referred to as "school." Plaintiff exhibited improvement in his affect as a consequence of the medication and his activities in the Total Life program.
18. On March 27, 2001, Leslie B. Hocking, M.D., a Staff Psychiatrist with Wake County Mental Health Services reported:
 "Sherry indicates that she is unable to provide 24-hour observation for her father, although she continues to visit frequently. She lives approximately ten minutes away and comes by to assist with meals and laying out the patient's medication. She feels that her dad most likely is taking his prescribed psychiatric medication regularly. The patient is resistant to, at times, his daughter's requests. For example, when she tells him to come in out of the yard and to stop grooming the yard, he refuses. She will then obtain assistance from male neighbors and the patient will agree to go back in the house."
Dr. Hocking also reported that plaintiff's daughter, Sherry Leathers, could not recall the mediations that plaintiff was taking, had found pills lying around, and that plaintiff had spent some nights outside. Dr. Hocking noted that some of plaintiff's prescriptions had expired and Sherry Leathers was not aware of whether plaintiff was taking his medications. Dr. Hocking reported concern for plaintiff's safety due to his lack of necessary supervision. On December 13, 2001, Dr. Hockings noted that Sherry Leathers was now living full time with plaintiff; however, it appeared that plaintiff's medication intervals were not correct and it seemed that plaintiff was not taking his medications. Dr. Hockings recommended that plaintiff be placed in a rest home. This request was resisted by Sherry Leathers.
19. On November 20, 2001, defendants filed a Motion to Compel plaintiff's cooperation with medical treatment. Defendants specifically sought plaintiff's cooperation regarding the formulation of a life care plan. On November 28, 2001, said motion was granted by Deputy Commissioner Houser. Defendants' evaluation of plaintiff's medical condition, preparation of a life care plan, and plaintiff's receipt of appropriate attendant care were delayed by actions of Ms. Leathers and counsel: Dr. Boone was asked not to provide information to defendants' life care planner, and defendants' life care planner was not allowed to meet with plaintiff and inspect the home on a timely basis.
20. Ruth Yutzy, R.N. and certified life care planner, was finally able to meet with plaintiff on January 10, 2001, and rendered her report concerning plaintiff's medical needs on January 21, 2001. Ms. Yutzy, consistent with the opinion of Dr. Hockings, found that plaintiff was not able to live by himself, that Ms. Leathers was not living with plaintiff, and recommended that plaintiff be placed in a small group home and that he continue with his participation in the Total Life Center.
21. Based on the greater weight of the competent evidence, including medical evidence, the Full Commission finds that Sherry Leathers was not living with plaintiff, did not provide him with 24-hour care or observation, was not aware of the medications that were prescribed to her father, could not confirm to the doctors whether her father actually took the medications, and was not able to control her father without the assistance of neighbors or others. The evidence suggests, and the Commission finds, that Sherry Leathers often assisted her father by preparing meals, setting his medications out, taking him to medical appointments, and attempting to get plaintiff settled for the evening. The greater weight of the competent evidence, however, fails to establish that Sherry Leathers was competent in performing these services. The Commission finds that it is medically reasonable and within the best interest of plaintiff that he either (1) be placed in a small group home and continue in the Total Life Center program for as long as he is capable of functioning in this environment as recommended by Ms. Yutzy, or (2) receive full-time, twenty-four hour attendant care by a licensed caregiver.
22. The Full Commission finds that on or after September 1999, Sherry Leathers did provide services to her father that were beneficial to his condition. This fact alone, however, does not render these services "treatment" or compensable as attendant care services. The Full Commission does not accept as credible the evidence presented concerning the number of hours that Sherry Leathers spent caring for her father. There is insufficient evidence to allow the Commission to determine the amount of time Sherry Leathers actually spent providing needed and compensatory assistance to her father.
23. Defendants contend that plaintiff's claim for attendant care services should be barred under the doctrine of laches. For the doctrine of laches to apply in this matter, defendants must show that plaintiff unreasonably delayed the presentation of his claim. As found above, the Full Commission finds that Sherry Leathers participated in a plan to thwart the defendants' investigation of plaintiff's need for attendant care. Further, even if Sherry Leathers had provided compensable services to her father from 1986 through August 2001 when the Form 33 was filed in this claim, her request for reimbursement for these services was not made within a reasonable time.
24. Based on the greater weight of the competent evidence, the Full Commission finds that plaintiff did not require attendant care before September 1999 when he began to exhibit unusual and destructive behavior. The medical records do not show that plaintiff's physicians were recommending attendant care from 1987 to 1999. Further, attendant care is regulated by the Industrial Commission's Medical Fee Schedule that generally requires that written authority be obtained by the Commission before practical nursing services are compensable. Plaintiff did not request payment for attendant care services from defendant before August 2000 and no physician mentioned attendant care until January 2001 when the subject was raised by Sherry Leathers in a conference that she had with Dr. Boone. Dr. Boone approved Mr. Carpenter's life care plan suggesting attendant care in August 2001, and Dr. Hockings recommended that plaintiff be placed in a care facility in December 2001. Therefore, attendant care, if any, provided after 1986 and prior to August 2001 is not compensable because it was not performed by or at the direction of a physician and was performed, if at all, without notice to the defendants and without timely seeking the approval of the Commission.
25. The greater weight of the evidence shows that Sherry Leathers was not competently performing the necessary attendant care services and that plaintiff, by at least December 2001, should have been placed in a group home or should have received other attendant care.
26. Defendants reasonably defended this claim.
 ***********
Based upon the foregoing findings of fact, the Full Commission enter the following:
 CONCLUSIONS OF LAW
1. Plaintiff has sustained a material change in his cognitive function to the extent that it is no longer medically reasonable for him to continue to live in his residence. Plaintiff would benefit from and medically requires placement in a small group home and continued participation in an activity program at the Total Life Center or a similar facility. Alternatively, plaintiff requires twenty-four hour attendant care by a licensed caregiver. N.C.G.S. §§ 97-2(19); 97-25.
2. Plaintiff is required to obtain prior approval from the Industrial Commission for reimbursement of the attendant care services provided by his daughter. N.C. Workers' Compensation Medical Fee Schedule § 14, Special Duty Nursing; Hatchett v. The Hitchcock Corp., 240 N.C. 591,83 S.E.2d 539 (1954); see also Godwin v. Swift Co., 270 N.C. 690,155 S.E.2d 157 (1967). Chapter 14 of the Workers' Compensation Medical Fee Schedule specifically states:
 "When deemed urgent and necessary by the attending physician, special duty nurses may be employed. Such necessity must be stated in writing when more than seven days of nursing services have been required.
. . .
 Except in unusual cases where the treating physician certifies it is required, fees for practical nursing services by members of the immediate family of the injured will not be approved unless written authority for the rendition of such services for pay is first obtained from the Industrial Commission."
This requirement in the Industrial Commission's fee schedule is consistent with the long established rule in North Carolina that practical nursing will not be honored unless written authority is first obtained from the Commission. See Hatchett v. The Hitchcock Corp.,supra. The Commission acknowledges that the "Special Duty Nursing" provision, quoted above, is included in Chapter 14 of the fee schedule, entitled "Hospital Fee Schedule." The Special Duty Nursing provision, however, is not limited to inpatient (i.e., hospital) services. The intent of the provision is to cover all special duty nursing and attendant care, and this is the Commission's standard practice and interpretation. The Commission finds that the last page in the hospital fee chapter contains several miscellaneous provisions, including the Special Duty Nursing and Home Health Agency provisions. The preauthorization requirement is necessary to place the employer/carrier on notice of the employee's need for such services, to cause an investigation as to the extent of the necessary services, if any, and to allow the employer to exercise its right to direct the medical care. See
N.C.G.S. § 97-25. The Legislature specifically authorized the Industrial Commission to adopt guidelines for attendant care, and the provisions of Chapter 14 of the Medical Fee Schedule are in accordance with the Legislature's directive. See N.C.G.S. § 97-25.4(a). The adopted guidelines for attendant care provided in Chapter 14 of the Medical Fee Schedule are consistent with prior appellate decisions condoning the Commission's policy of pre-approval for family attendant care. See Godwin v. Swift Co., 270 N.C. 690, 155 S.E.2d 157
(1967); Hatchett v. The Hitchcock Corp., supra.[1] The preauthorization provisions of Chapter 14 of the Medical Fee Guidelines are reasonable and are intended to ensure that injured employees are provided the services and care intended under the Act and that medical costs are reasonably contained. See N.C.G.S. § 97-25.4(a). The request for payment for these services must be made within a reasonable amount of time. SeeSchofield v. Great Atlantic Pacific Tea Co., 299 N.C. 582,264 S.E.2d 56 (1980). Therefore, Sherry Leathers' request for payment for attendant care services allegedly provided before August 2000, when she gave notice to defendants, should be denied. N.C.G.S. § 97-25.4(a); Chapter 14, North Carolina Industrial Commission Medical Fee Schedule.
3. Plaintiff is entitled to receive reasonable and necessary medical services and other treatment as may reasonably be required to effect a cure or give relief. N.C.G.S. §§ 97-2(19), 97-25. Attendant care services can be compensable under the Act. See London v Snak TimeCatering, 136 N.C. App. 473, 525 S.E.2d 203 (2000). Under Section 97-2(19) of the Act, attendant care provided by a family member is compensable provided the care is "treatment" and provided it is "reasonable and necessary." In determining this question, the Commission finds persuasive the guidance of the Virginia Supreme Court and several other jurisdictions that have used the following four-point standard to determine whether attendant care is reasonable and necessary treatment:
 . . . [T] he employer must pay for the care when it is performed by a spouse, if (1) the employer knows of the employee's need for medical attention at home as a result of the industrial accident; (2) the medical attention is performed under the direction and control of a physician, that is, a physician must state home nursing care is necessary as a result of the accident and must describe with a reasonable degree of particularity the nature and extent of duties to be performed by the spouse; (3) the care rendered by the spouse must be of the type usually rendered only by trained attendants and beyond the scope of normal household duties; and (4) there is a means to determine with proper certainty the reasonable value of the services performed by the spouse."
Warren Trucking Co. v. Chandler, 221 Va. 1108, 277 S.E.2d 488 (1981);Kenbridge Const. Co. v. Poole, 25 Va. App. 115, 486 S.E.2d 567 (1997); see also In Re Klapacs's Case, 355 Mass. 46, 242 N.E.2d 862 (1968); Rossv. Northern States Power Co., 442 N.W.2d 296 (Minn. 1989); Larson v.Squire Shops, 228 Mont. 377, 742 P.2d 1003 (1987); St. Clair v. County ofGrant, 110 N.M. 543, 797 P.2d 993 (N.M.Ct.App. 1990). Services that primarily consist of prompting or giving "verbal cues" are not compensable medical services or treatment. See Little Rock Convention and VisitorsBureau, 60 Ark. App. 82, 959 S.W.2d 415 (1997); Warren Trucking Co. v.Chandler, supra. The determination of whether attendant care is compensable medical treatment is generally a question of fact. Alexanderv. LaLonde Enterprises, 288 N.W.2d 18 (Minn. 1980); see London v SnakTime Catering, 136 N.C. App. 473, 525 S.E.2d 203 (2000). To the extent that the limited services provided by Sherry Leathers to her father consisted of prompting and verbal cues to take medication, eat meals, perform daily hygiene, and come in at night, said activity is not "treatment" within the contemplation of the Act, and thereby are not compensable services. Further, to the extent that these services were not under or at the direction of a physician, they are not compensable treatment. N.C.G.S. §§ 97-2(19), 97-25; see Warren Trucking Co. v.Chandler, supra.
4. Plaintiff's claim for attendant care services by Sherry Leathers should be denied. N.C.G.S. §§ 97-2(19); 97-25, 97-25.4(a).
5. Plaintiff's claim for attorney's fees for obtaining attendant care services should be denied. To the extent that they were allowed to do so, defendants reasonably and promptly investigated the need for attendant care and have offered a reasonable plan for plaintiff's care.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay for plaintiff's ongoing medical expenses including either (1) placement in a small group home and participation in an activity program at the Total Life Center or a similar facility, or (2) twenty-four hour attendant care at plaintiff's home by a licensed caregiver.
2. Plaintiff's claim for attendant care services by Sherry Leathers, and the claim for attorney's fees, is denied.
3. Each party shall pay its own costs.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING IN A SEPARATE OPINION:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART IN A SEPARATE OPINION:
 S/____________ BUCK LATTIMORE CHAIRMAN
[1] The Commission notes that some more recent Court of Appeals decisions have discussed the approval of past attendant care without addressing the Commission's guidelines that are contained in Chapter 14 of the Medical Fee Schedule. See Ruiz v. Belk Masonry Co., Inc.,148 N.C. App. 675, 559 S.E.2d 249 (2002) (finding that pre-approval is not required under § 97-90(a)); London v. Snak Time Catering, Inc.,136 N.C. App. 473, 525 S.E.2d 203 (2000) (approving family attendant care without addressing pre-approval requirements). The Commission suggests that these decisions are not precedent for allowing attendant care without prior Commission approval because the requirements of Chapter 14 of the Medical Fee Schedule were not presented to the Court of Appeals for its consideration in these cases and they were not analyzed in conjunction with the Legislature's directive authorizing the Industrial Commission to develop guidelines for attendant care. See N.C.G.S. §97-25.4(a).