***********
Having reviewed the record, the Deputy Commissioner Opinion and Awards, and the parties' briefs, and having heard argument of counsel, the Full Commission modifies in part and reverses in part the prior Opinion and Awards.
 Evidentiary Rulings
Plaintiff appeals two evidentiary rulings by Deputy Commissioner Berger: the sustaining of defendant's objection and striking of the testimony of Stephen Carter on page 11, lines 12-13, of Carter's deposition; and the sustaining of defendant's objection on page 29, line 14, of Dr. Fozdar's deposition. The Full Commission determines that these objections should have been overruled.
 Motion to Consider Additional Evidence
Defendant has filed a Motion to Consider Additional Evidence and asks that the Commission accept additional evidence, in the form of affidavits from Katie Greer and Glenda Y. Linton, with attachments. This evidence is offered to assist the Commission in determining plaintiff's correct average weekly wage, whether defendant is entitled to a credit for overpayment of benefits, and if defendant is entitled to a credit, the amount of the credit. Plaintiff contends that defendant is precluded from filing the additional documents because this motion was in effect denied by the deputy commissioner, does not meet the criteria of Rule 60 for newly discovered evidence, and defendant is attempting to reduce the average weekly wage without a showing of mutual mistake. The Commission finds that the issue of average weekly wage is properly before the Commission and that, as the trier of fact, the Full Commission requires competent evidence relevant to this issue. Because there is no challenge to the authenticity and competency of the additional evidence, the Full Commission grants defendant's motion and allows the admission of the additional evidence.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, N.C. Gen. Stat. §97-1 et seq., and there are no time bars asserted under N.C. Gen. Stat. § 97-22 or N.C. Gen. Stat. § 97-24.
2. An employee-employer relationship existed between the plaintiff and the defendant-employer at all times relevant hereto.
3. Ezzell Trucking, Inc., is a qualified self-insurer and Key Risk Management Services, Inc. is the adjusting service on the claim.
4. On or about December 4, 1996, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with Ezzell Trucking, Inc.
5. The defendant filed an I.C. Form 60, "Employer's Admission of Employee's Right to Compensation Pursuant to N.C. Gen. Stat. §97-18(b)" dated December 5, 1996. The defendant has since filed an I.C. Form 62, filed on September 14, 2000.
6. The plaintiff last worked for the defendant-employer on December 4, 1996.
7. Exhibits, indexed and attached to the Pre-Trial Agreement under Tabs 1 through 25, were received into evidence without need of further authentication.
8. The nature of compensation plaintiff is claiming is permanent total compensation, compensation for medical treatment, attendant care reimbursement, and items more particularly described in the life care plan attached to the Pre-Trial Agreement and incorporated by reference.
9. The dates during which plaintiff alleges entitlement to the compensation identified in stipulation no. 8 above, for both medical and indemnity, are from the date of injury for life. Plaintiff also seeks attendant care reimbursement, both past and future, as well as the other items contained in the life care plan.
10. Subsequent to the filing of the Interlocutory Opinion and Award filed by former Deputy Commissioner William Bost, the parties submitted the medical records of Dr. Sink and Dr. Woods. These records were marked as stipulated exhibit 26 and received into evidence.
 ***********
Based upon all the competent evidence of record and reasonable inferences drawn therefrom, the Full Commission makes the following additional
 FINDINGS OF FACT
1. On December 4, 1996, plaintiff was driving a tractor-trailer truck, transporting a load of turkeys, in the course of his employment with Ezzell Trucking, Inc. The truck overturned while rounding a curve and landed upside down. Plaintiff was thrown about in the cabin of the truck as he was unrestrained by a seat belt at that time.
2. As a result of the trucking accident while employed with Ezzell Trucking, Inc., plaintiff sustained trauma to his head, neck, back, hip and leg. Because of evidence of bleeding inside of his brain, he was transported from a local medical facility immediately to Duke University Medical Center, which has been his primary health care provider since that time.
3. As a result of his tractor-trailer accident while employed with Ezzell Trucking, Inc., plaintiff sustained a contusion to his brain with focal areas of bleeding on the right frontal lobe. He also sustained a compression fracture to his thoracic spine at level T10-T11, a cervical disk herniation at level C5-C6, and a lumbar spinal disc herniation at L5-S1. The compression fractures to the thoracic vertebra were treated conservatively but the cervical vertebrae required a diskectomy and anterior fusion. The lumbar spine required a hemilaminectomy at L4-5. The dates of these surgeries were November 10, 1997, and September 28, 1998.
4. Since the date of injury plaintiff has not returned to work. Plaintiff's physicians do not anticipate that plaintiff will be able to return to gainful employment as a result of the injuries sustained in the accident.
5. Plaintiff's wife, Terri Simmons, testified regarding plaintiff's behaviors and the care she provides. Ms. Simmons explained that before the injury her husband was a quiet man and after the injury he "screams all the time" and "cusses." She further explained that "all the time" plaintiff would sleep for extended days and described that plaintiff would at times have a normal sleeping pattern and then would have periods when he would sleep for several days if she or others did not wake him to drink and eat. Other behavior which Ms. Simmons contends necessitates attendant care for plaintiff includes: (1) compulsive behavior in drinking Pepsi; (2) compulsive behavior in washing his hands; (3) vomiting "a lot"; (4) needing to be reminded to brush his teeth, take a shower, and change his clothes; (5) problems with memory and resulting anger and frustration; (6) an obsession with knife sharpeners and constantly purchasing them; (7) walking around with paper towels under his arm; (8) taking "everything" apart, such as dryers, VCR, and other equipment, and not putting them back together; (9) failing to take his medication without assistance or prompting; (10) constantly ("150 million times a day") calling Ms. Simmons when she is not home; (11) constantly spending money including purchasing "a million dollars worth of tools"; and (12) needing Ms. Simmons to prepare food. Ms. Simmons feels that her husband cannot be left alone and when asked why she had this feeling, she expressed that she did not know and feared what he would do if left alone.
6. In contrast to this testimony, Ms. Simmons acknowledged several factors which tend to show that plaintiff is capable of independent living and may not need attendant care: (1) Plaintiff has a drivers' license and regularly drives the family's vehicle. Plaintiff drove Ms. Simmons to the deputy commissioner hearing, regularly drove their daughter to and from school (before she was home schooled), and "constantly" drives to the local convenience store and other locations each day. Although Ms. Simmons described an incident when plaintiff got lost in Greensboro and said that he has obtained a few traffic tickets, her testimony is that she has ridden with him and feels safe with his driving. Plaintiff routinely drives to his physician appointments at Duke, which is a significant distance from plaintiff's residence. Ms. Simmons has ridden with plaintiff on out of state trips. (2) Plaintiff is often left alone and he has not injured himself or others while not under the immediate direction of Ms. Simmons or others. (3) No legal proceedings have been contemplated or instituted to have plaintiff declared incompetent or to take away his driving privileges. (4) Plaintiff routinely handles money, has a bank account, uses credit cards, and signs their joint tax return, although Ms. Simmons takes care of the household finances. Plaintiff regularly goes to fast food restaurants, convenience stores, and other locations and purchases breakfast, lunch, snacks, gas, and otherwise handles these affairs without the assistance of others.
7. Ms. Simmons testified that she was the primary provider for plaintiff's needs and questioned whether a "sitter" or other stranger could provide comparable services for her husband. Despite the suggestion that Ms. Simmons was available and provided care to plaintiff all thetime, she was not able to provide testimony to allow the Commission to determine the average number of hours that she was working and the average time that she spent assisting plaintiff. Ms. Simmons testified that she left her former employment and started her own newspaper (The Southern Trader) because she had to miss too much time from the office due to plaintiff's numerous doctors appointments; however, there was no evidence, other than having more free time and the ability to work at or near home, that this change involved a financial loss.
8. The Full Commission finds that Ms. Simmons' testimony contained exaggerations, and thus the credibility of her testimony is questionable. The Deputy Commissioner made the following finding:
 Plaintiff's wife is not a completely reliable historian. Plaintiff's wife over generalized and exaggerated to make her point about her husband's aberrant behavior. During her in court testimony she made the following claims that the undersigned finds to not be credible: plaintiff screams all the time, plaintiff has 5000 knife sharpeners, plaintiff takes apart everything she owns, plaintiff has purchased a million dollars worth of tools from the shopping channel, plaintiff stays in the bathroom 12 to 13
hours vomiting, and she has to deal with doctors all day long, everyday of the week.
Having reviewed the entire record in this case, the Full Commission agrees with the Deputy Commissioner's assessment of Ms. Simmon's testimony and finds that her exaggeration of plaintiff's condition must be considered in weighing the evidence.
9. Kenneth Chambers also testified at the deputy commissioner hearing. Mr. Chambers is Ms. Simmons' first cousin and is currently in her employ. Mr. Chambers testified that plaintiff would sometimes sleep for extended periods of time and sometimes would come down to the office where Mr. Chambers and Ms. Simmons worked. Mr. Chambers indicated that sometimes plaintiff was in a bad mood, sometimes was funny, and that his mood was erratic. Mr. Chambers would "check on" plaintiff if Ms. Simmons was running an errand. Mr. Chambers confirmed Ms. Simmons' testimony that plaintiff would purchase knife sharpeners, called the office "constantly" (five to ten times a day), kept a bandana or paper towel under his arm, drove to the convenience store frequently, and washes his hands constantly. Mr. Chambers also testified that he has ridden with plaintiff at the wheel without concern for his own safety. Mr. Chambers has been with plaintiff when plaintiff went to the bank to cash checks and made purchases at fast food stores. Mr. Chambers indicated that plaintiff was able to accomplish these tasks without his assistance.
10. Defendant hired a private investigator, Thomas Maiolo, to perform surveillance on plaintiff. Mr. Maiolo testified that he observed plaintiff on several occasions and that he did not observe any bizarre activities. Plaintiff was observed taking his daughter to school, stopping at fast food restaurants, and driving to Duke VA Hospital. Plaintiff was observed driving without any passengers and Mr. Maiolo characterized his driving as normal with driving at the speed limit, give or take 5 miles per hour, and no weaving or unusual movements. Mr. Maiolo never saw plaintiff with paper towels under his arm, never saw him vomit, never saw him lose his balance, and did not observe any other unusual behavior. Mr. Maiolo never saw plaintiff engage in any behavior that could be considered dangerous. Plaintiff did not display aggressive behavior.
11. Plaintiff employed a registered nurse, Kelly Lance, from Utah, to prepare a life care plan and to provide testimony concerning plaintiff's need for attendant care. Ms. Lance has a bachelors degree in nursing and has established a nursing association, American Association of Nurse Life Care Planners, which assists in training nurses to write life care plans. Her business is called Kelynco. Ms. Lance does not have a nursing license in North Carolina and has never been to North Carolina. In developing the life care plan for plaintiff, Kelly Lance had contact with Ms. Simmons, plaintiff's two attorneys, Dr. Fozdar, and Dr. Gorecki. In addition, she reviewed medical records concerning plaintiff. Ms. Lance, however, has not spoken with plaintiff and has not traveled to North Carolina or otherwise observed plaintiff. Ms. Lance testified that Ms. Simmons described plaintiff as having an aggressive behavior, memory problems, and an obsessive-compulsive behavior, with examples of frequently driving to the store. Ms. Lance opined that plaintiff needs someone to watch him, administer medications, remind him to eat, and remind him to do his daily hygiene, so that Ms. Simmons will be able to perform her duties at work and continue to support the household. Ms. Lance testified that plaintiff does not have any "medical-skilled nursing" needs but that he needs someone to cue him to take a shower, to brush his teeth, and to wake him up. Ms. Lance performed a labor market survey and determined that the unskilled services needed by plaintiff could be performed for $6.00 to $8.00 per hour, with an average of $7.00 per hour.
12. Ms. Lance testified that she contacted Dr. Gorecki's office, but chose not to work with him because he had not seen plaintiff recently and was seeing plaintiff on an as-needed basis only. Ms. Lance prepared her proposed life care plan, made a telephone appointment with Dr. Fozdar, and sent the plan to him. She testified that she went through the life care plan line by line with Dr. Fozdar and that he added a TENS unit and otherwise agreed to the plan. Dr. Fozdar signed the life care plan on September 5, 2000.
13. Ms. Lance testified that she did not perform a home interview, and both her report and deposition testimony state that it is difficult to assess the plaintiff's needs accurately without the home interview with plaintiff and his family. Ms. Lance stated that Ms. Simmons contacted her because she was looking for someone to help her develop a life care plan that would reflect the needs of her husband. Ms. Simmons had expressed that she already had a life care plan and that she was not pleased with that plan and the lack of follow up by the life care planner. At her deposition, Ms. Lance conceded that much of the information contained in the life care plan came from Ms. Simmons and was not independently reflected in plaintiff's medical records. This includes references to plaintiff falling "quite often," cognitive losses, frequent trips to the convenience store, getting lost while driving, frequent vomiting, cutting his hands on several occasions with knives, and other information. On the other hand, Ms. Lance was not aware that plaintiff drove his daughter to and from school without adult supervision, went to restaurants and purchased items on his own, drove to the gasoline station and purchased gas, and was able to perform other independent acts.
14. The Kelynco life care plan calls for 24 hour custodial care for problems with remembering, wandering, incontinence, confusion, and preparation of a special diet. This life care plan provided three levels of "companion" care which ranged from an estimated $9,600 per year to $83,475 per year for the proposed services. The $9,600 figure is purported to represent care at $7.00 per hour for an average cost of $800.00 per month for an unskilled worker; this computes to less than the twenty-four hour care stated in the plan. At the middle range, Ms. Kelly estimated $28,800 per year for a skilled home health aid at $15.00 per hour; again this sum computes to less than the twenty-four hour care stated in the plan. At the high end, the life care plan estimates the cost of in-patient custodial care at the rate of $225.00 per day, $1,575.00 per week, or $83,475.00 per year. This would compute an average rate of $9.375 per hour, or approximately $7.00 per hour for the first eight hours of each day and $10.50 per hour (time and one-half) for each hour over eight per day. $83,475 is well in excess of typical nursing home expense in North Carolina. (Ms. Lance appears to inflate the value of the nursing services to provide for time and a half after eight hours per day. The Commission, however, notes that under the Fair Labor Standard Act, "companion services," such as those suggested by Ms. Lance, are exempt from the standard time and a half overtime pay provisions. Armaniv. Maxim Healthcare Services, 53 F. Supp.2d 1120 (D.Colo. 1999);29 U.S.C. § 213(a)(15); 29 C.F.R. § 552.6.
15. Plaintiff also offered the deposition testimony of Stephen D. Carpenter, a rehabilitation counselor on the issue of the relative value of the attendant care services. Mr. Carpenter was asked to determine the cost for attendant services in the Sampson County area for the level of services required by the Kelynco life care plan. Mr. Carpenter testified that nursing and sitting services are available from several potential sources with unskilled sitting services ranging from $7.00 to $10.00 per hour with an average of $8.50 per hour, and CNA credentialed attendants ranging up to $15.00 per hour. Mr. Carpenter testified that most of the placement agencies require a minimum of two hours per day, plus payment of travel expenses. Mr. Carpenter was not requested to evaluate plaintiff for attendant care and rendered no opinions concerning the necessity for these services.
16. Manish Fozdar, M.D., is a board-certified psychiatrist who currently serves as plaintiff's primary treating physician. Dr. Fozdar, a physician at Duke University Medical Center, first saw plaintiff on August 31, 1998, when he took over plaintiff's care from Dr. Goli, another psychiatrist at Duke. Dr. Fozdar testified that plaintiff sustained a frontal lobe bleed as a result of the vehicular accident made the basis of this workers' compensation claim. Plaintiff's Glasgow Coma Scale score was a 15 which is consistent with a mild head injury. Dr. Fozdar has diagnosed plaintiff with several conditions, including chronic low back pain, and mood disturbance and cognitive deficit secondary to traumatic brain injury. Plaintiff has been prescribed Prozac as an anti-depressant to control behavioral outbursts, Tegritol for seizures and to control behavioral outbursts, Percocet as an analgesic for pain, Neurotin for leg pain, and Ritalin to treat symptoms such as apathy and depression, together with attention and concentration problems. Dr. Fozdar explained that plaintiff continues to experience cognitive problems, but plaintiff has denied any feelings indicative of significant depression. Plaintiff has on occasion failed to take his medication as scheduled and has failed to keep appointments to obtain refills for his medication, if not reminded by his wife.
17. Dr. Fozdar explained that irregular sleep cycle and sleeping too much has been reported in plaintiff's case and that this was not uncommon in patients with closed head injuries. Dr. Fozdar denied that repeated vomiting has been reported to him, although he has seen references to this condition in other medical records. Dr. Fozdar does not know whether vomiting is related to plaintiff's head injury. Dr. Fozdar explained that plaintiff's prominent symptom from his head injury is apathy, i.e., a lack of motivation or goal-directed activity. The apathy surfaces in plaintiff's lack of attention to hygiene and routine household chores. Dr. Fozdar explained that, because of plaintiff's cognitive difficulties, plaintiff is likely to get lost while driving in unfamiliar areas and may have difficulty following directions. Dr. Fozdar, however, does not recommend taking away plaintiff's driving privileges and advises that plaintiff's driving is discretionary.
18. Dr. Fozdar stated that he reviewed and signed off on the Kelynco life care plan. Dr. Fozdar testified that he believes that plaintiff would benefit from having a companion to help him in certain areas of day-to-day functioning. In particular, plaintiff could benefit from supervision for his medications and encouragement to participate in activities that would be beneficial to his rehabilitation. Dr. Fozdar explained that these services could be performed by Ms. Simmons and were at an unskilled level. (There is no evidence, however, that Ms. Simmons has attempted to help plaintiff participate in activities that might be rehabilitative.) From Dr. Fozdar's deposition it is apparent that Ms. Lance's life care plan was prepared by her, faxed to Dr. Fozdar, followed by a telephone conversation with Dr. Fozdar, and then the faxing of the single signature page which was signed by Dr. Fozdar and returned to Ms. Lance. Dr. Fozdar was not provided with the final report from Ms. Lance.
19. Dr. Fozdar testified that he is not aware of any medical records that indicate that plaintiff has had repeated falls or a knife fetish. With reference to the issue of dangerous behavior by plaintiff, Dr. Fozdar was not directly aware of any such behavior, but that plaintiff's wife had reported that plaintiff got lost in his car and this could present a danger. Dr. Fozdar has no reports of obsessive-compulsive behavior by plaintiff and has not documented any speech impediment. In addition, Dr. Fozdar has not made a recommendation of a referral of plaintiff to an ophthalmologist, as stated in Ms. Lance's life care plan.
20. Dr. Fozdar has not restricted or contemplated restricting plaintiff's driving privileges, nor would he suggest that plaintiff's parental rights be limited or that plaintiff be declared incompetent or that plaintiff was otherwise unable to take care of his personal affairs. Dr. Fozdar testified that he would not be surprised to find out that plaintiff drives on his own without supervision.
21. On the issue of attendant care, Dr. Fozdar testified that he does not have a concern about the adequacy of plaintiff's current supervision. In plaintiff's case, his needs are adequately taken care of by his wife. Dr. Fozdar opined that plaintiff would benefit from reminders about hygiene, proper nutrition, and taking his medication. Hedoes not need constant, twenty-four hour supervision (which was prescribed in the life care plan) as would a person who is severely mentally retarded or has severe dementia. Significantly, Dr. Fozdar did not see any problem in leaving plaintiff unsupervised for periods of time.
22. Dr. Fozdar does not anticipate that plaintiff will be able to return to gainful employment.
23. The parties stipulated to an undated note, Exhibit 10 (page 322) addressed "[t]o whom it may concern" which is signed by Allison Taylor, Dr. Goli's physician assistant. Attached to Dr. Gorecki's deposition is the same note which contains a date stamp of "Jan 07 1999." This note describes "extensive hours of care" provided by Ms. Terry Simmons to her husband and suggests that plaintiff's wife spends "nine to ten hours a day to his care with maintaining his medication and daily plan." Neither Ms. Taylor nor Dr. Goli are witnesses in this action, and the circumstances concerning the preparation or signing of this note are unknown. Further, the typesetting on the note does not match the typeface for other medical records in evidence, and the author of the note is uncertain. The stipulated medical records also contain a letter from Dr. Gorecki, Exhibit 11 (page 324), explaining that Ms. Simmons has provided "supportive care at great expense." Dr. Gorecki, however, expressly testified that he did not find that plaintiff needs attendant care. Although plaintiff suggests that Ms. Taylor's note indicates that Dr. Goli recommends attendant care, the similar statement in Dr. Gorecki's record, together with his testimony that attendant care is not medically necessary, leads the Commission to believe that plaintiff's inference is not well founded. The Full Commission has reviewed the medical records in evidence and notes that there are no significant references to plaintiff needing confinement or attendant care. There is no prescription or other written note from Dr. Goli, Dr. Fozdar, or any other physician recommending attendant or home health care, and their medical records do not reflect a request for or document the need for attendant care.
24. John P. Gorecki, M.D., is the neurosurgeon who provided treatment to plaintiff from the date of his injury (or a few days after) until May 1999, when plaintiff was released to return on an as-needed basis. Dr. Gorecki testified that Ms. Simmons has contacted him wanting a form "or something" completed to express her difficulty in taking care of plaintiff. Dr. Gorecki stated that he has never made any attempt to have plaintiff declared incompetent. On office testing, plaintiff seemed to do reasonably well. Dr. Gorecki believes that plaintiff is able to live independently and does not require constant supervision. Dr. Gorecki never noticed any unusual speech patterns, obsessive-compulsive behavior, knife cuts, or other unusual activity. Plaintiff's wife complained about prominent mood swings and of a vicious mood, but Dr. Gorecki saw no indication of such behavior. Plaintiff would occasionally become agitated during his office visits with Dr. Gorecki, but these occurrences did not require intervention. Dr. Gorecki does not believe that plaintiff needs attendant care. On one visit, in 1997, there was suggestion that plaintiff had passive suicidal ideation and Dr. Gorecki referred plaintiff to the department of psychiatry, but there was nothing significant with that examination to warrant attendant care. Although Dr. Gorecki testified that he would defer to the opinions of physicians from the psychiatric department, the Commission finds that the treating doctor, Dr. Fozdar, has not prescribed or documented the need for attendant care.
25. Dr. Gorecki does not anticipate that plaintiff will be able to return to any form of employment.
26. Although not dispositive of the issues in this case, the Commission notes that the plaintiff's Form 33 Request for hearing, filed March 9, 1999, lists only Dr. Gorecki as plaintiff's anticipated medical witness on the issue of attendant care. Dr. Gorecki does not believe that plaintiff needs attendant care. Although plaintiff is not limited to calling the physicians listed on the Form 33, the fact that the only listed physician on the Form 33 did not recommend attendant care is significant. In fact, no physician had recommended attendant care when plaintiff requested a hearing on the issue. The Kelynco life care plan was prepared in June 2000 and signed by Dr. Fozdar three months later.
27. Plaintiff was evaluated by C. Thomas Gualtieri, M.D., a board-certified psychiatrist in Chapel Hill, North Carolina, at defendant's request. Dr. Gualtieri testified that he examined plaintiff, consulted with plaintiff's wife, reviewed medical records, and had psychiatric/psychological tests performed. Based on his review of the available information and his observations of plaintiff, Dr. Gualtieri testified that he did not see a need for attendant care. In contrast, however, Dr. Gualtieri explained that Ms. Simmons described severe behavior problems that he did not observe and which are not recorded in the medical records, and stated that, if her descriptions were correct, further treatment, medications and other modalities might be prudent and should be explored before a lifetime commitment to attendant care is considered. Plaintiff's treatment, which primarily consists of Prozac, Ritalin, and Neurotin, is a benign combination of low-dose medications which could easily be changed, if plaintiff needs more aggressive treatment.
28. Dr. Gualtieri expressed that attendant care is not taken lightly in the medical profession, that attendant care generally is not approved on the basis of a prescription or note from a doctor, and that a physician suggesting attendant care needs to document continuously throughout the course of the treatment any problems which necessitate the request for attendant care. The records made available to Dr. Gualtieri did not document a need for attendant care, and his own examination of plaintiff showed a remarkably recovered individual, given plaintiff's injury. Most patients who require attendant care either have severe physical disabilities or they are mentally incompetent, and plaintiff does not fall into either category.
29. Dr. Gualtieri also explained that a life care planner should visit with the person for whom they are writing the plan. In addition, the value of the life care plan depends upon whether the treating physician can justify and defend the necessity of each specific recommendation in the plan. Dr. Gualtieri also questioned the Kelynco plan because Ms. Lance was aware that Dr. Gorecki did not approve attendant care; her report should have addressed this issue and attempted to reconcile why Dr. Gorecki had a differing opinion.
30. Defendant also had plaintiff consult with Carol Harris, R.N., concerning the need for attendant care services. Ms. Harris is a registered nurse and a certified case manager in North Carolina. Ms. Harris and a co-worker, Judy Meyer, met with plaintiff, his wife, and his attorney, Dale Johnson, in his attorney's office. Ms. Harris requested a home interview, but this request was denied by plaintiff, or plaintiff's counsel. Ms. Harris interviewed plaintiff for an hour and a half. She noted that he appeared clean, well groomed, and was calm. No scars were noticed on his hands. He answered questions appropriately, did not exhibit memory problems, and did not exhibit any obsessive-compulsive behavior. Ms. Harris stated that she did not observe any behavior that would support attendant care, but she stated that she is not qualified to make the psychiatric assessment and suggested a neuropsychological consultation. Ms. Harris explained that a home assessment is vital in preparing a life care plan or otherwise addressing attendant care issues. When a home assessment is not possible, the care planner should at least meet with and interview the patient.
31. Ms. Harris also interviewed Ms. Simmons. Her conclusion was that, based on plaintiff's wife's report of plaintiff's condition, plaintiff would require attendant care. Her observation of plaintiff, and her review of his medical records, however, were not consistent with the impression given by plaintiff's wife. Therefore, Ms. Harris stated that she would recommend a neuropsychological examination to evaluate plaintiff's condition to resolve the conflicting information.
32. The Commission notes that neuropsychological testing was performed at Duke prior to Ms. Harris' assessment of plaintiff and was subsequently performed by Dr. Gualtieri in conjunction with his independent medical examination.
33. No prior approval was sought from the Industrial Commission for the attendant care services for which Ms. Simmons seeks reimbursement. The circumstances surrounding the alleged need for attendant care were not urgent or unusual.
34. Ms. Simmons is not an accurate historian and is prone to exaggeration in explaining plaintiff's behaviors. Any recommendations based on evidence received solely from Ms. Simmons are entitled to less weight. Plaintiff's medical records are entitled to greater weight on the issue of the reasonable and necessary medical attention and treatment that plaintiff needs. The medical records do not document the plaintiff's inability to live independently and his need for constant supervision. To the contrary, although the medical records support that plaintiff has sustained serious injuries which will most likely preclude his ability to return to work, plaintiff does have sufficient cognitive function and physical and mental facility to take care of his personal daily needs.
35. The opinions of Kelly Lance are discounted and entitled to less weight because she did not speak with the plaintiff, did not perform a home interview, relied almost exclusively on information from plaintiff's wife or attorneys, and did not consult plaintiff's health care providers or seek their opinions before she developed the plan. Contrary to standard practice, as explained by Dr. Gualtieri, Ms. Lance prepared her life care plan before she contacted the treating physicians, and she did not account for Dr. Gorecki's opinion that attendant care was unnecessary.
36. Dr. Fozdar's recommendation for attendant care is based on the fact that plaintiff benefits from reminders about hygiene, proper nutrition, and taking his medication. Such reminders do not rise to the level of medical treatment or services contemplated by the Act. The level of attention that has been suggested is not to be performed under the direction and control of a physician and has not been described with sufficient particularity as to the nature and extent of duties to be performed. Indeed, the Deputy Commissioner's award of three hours of attendant care, rather than the 16 to 24 hours requested by plaintiff, reflects the uncertainty of what duties beyond normal household tasks were involved. Likewise, even Dr. Fozdar said plaintiff needed "somewhere between prompting and twenty-four hour care." The Full Commission finds that there is a need for prompting but that attendant care is not required to accomplish that need. The suggested prompting does not require particular medical training or skill and does not extend beyond the scope of typical spousal or household activity. Further, there is no reasonable basis on which to determine with sufficient certainty the reasonable value of the services.
37. The greater weight of the competent medical evidence is that plaintiff is legally competent, that he is able to live independently, and that he does not need to be institutionalized or otherwise supervised on a twenty-four hour basis. The evidence fails to show that the plaintiff is a danger to himself or to others. None of the alleged aberrant behavior described by Ms. Simmons has resulted in injury to the plaintiff or others. Plaintiff's wife does not carefully supervise plaintiff's daily activity and does not need to supervise plaintiff in order to guard against harm to plaintiff or others.
38. The Full Commission finds that plaintiff has not established that he is entitled to attendant or nursing care.
39. The Full Commission finds that plaintiff has received reasonable and necessary care by and at the direction of Dr. Fozdar. It would appear that plaintiff might benefit from vocational counseling and training in order to provide some activity for him and counteract his boredom, frustration, and apathy, and reduce the psychological sequella of his injury.
40. Plaintiff earned $32,845.69 during the 52 calendar weeks prior to his injury for an average weekly wage of $631.65 and a compensation rate of $421.10.
 ***********
Wherefore, based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff is permanently and totally disabled and has been permanently and totally disabled since December 4, 1996, the date of his injury by accident. N.C.G.S. § 97-29.
2. Plaintiff is required to obtain prior approval from the Industrial Commission for reimbursement of the attendant care services provided by his wife. N.C. Workers' Compensation Medical Fee Schedule § 14, Special Duty Nursing; Hatchett v. The Hitchcock Corp., 240 N.C. 591,83 S.E.2d 539 (1954); see also Godwin v. Swift Co., 270 N.C. 690,155 S.E.2d 157 (1967). Chapter 14 of the Workers' Compensation Medical Fee Schedule specifically states:
 When deemed urgent and necessary by the attending physician, special duty nurses may be employed. Such necessity must be stated in writing when more than seven days of nursing services have been required.
. . .
 Except in unusual cases where the treating physician certifies it is required, fees for practical nursing services by members of the immediate family of the injured will not be approved unless written authority for the rendition of such services for pay is first obtained from the Industrial Commission.
This requirement in the Industrial Commission's fee schedule is consistent with the long established rule in North Carolina that practical nursing would not be honored unless written authority is first obtained from the Commission. See Hatchett v. The Hitchcock Corp.,supra. The Commission acknowledges plaintiff's argument that the "Special Duty Nursing" provision, quoted above, is included in Chapter 14 of the fee schedule, entitled "Hospital Fee Schedule." The Special Duty Nursing provision, however, is not limited to inpatient (i.e., hospital) services. The intent of the provision is to cover all special duty nursing and attendant care, and this is the Commission's standard practice and interpretation. The Commission finds that the last page in the hospital fee chapter contains several miscellaneous provisions, including the Special Duty Nursing and Home Health Agency provisions. Therefore, the Commission finds that the past attendant care sought by plaintiff is not compensable because plaintiff did not seek written authority from the Commission within a reasonable time after the rendition of such services were required. The preauthorization requirement is necessary to place the employer/carrier on notice of the employee's need for such services, to cause an investigation as to the extent of the necessary services, if any, and to allow the employer to exercise its right to direct the medical care. See N.C.G.S. § 97-25.
3. Plaintiff is entitled to receive reasonable and necessary medical services and other treatment as may reasonably be required to effect a cure or give relief. N.C.G.S. §§ 97-2(19), 97-25. Attendant care services can be compensable under the Act. See London v Snak TimeCatering, 136 N.C. App. 473, 525 S.E.2d 203 (2000). The attendant or nursing care sought by plaintiff, however, is not compensable medical compensation under the North Carolina Workers' Compensation Act. See
N.C.G.S. §§ 97-2(19), 97-25. Under Section 97-2(19) of the Act, attendant care provided by a spouse is compensable provided the care is "treatment" and provided it is "reasonable and necessary." In determining this question, the Commission finds persuasive the guidance of the Virginia Supreme Court and several other jurisdictions which have used the following four point standard to determine whether attendant care is reasonable and necessary treatment:
 . . . [T]he employer must pay for the care when it is performed by a spouse, if (1) the employer knows of the employee's need for medical attention at home as a result of the industrial accident; (2) the medical attention is performed under the direction and control of a physician, that is, a physician must state home nursing care is necessary as a result of the accident and must describe with a reasonable degree of particularity the nature and extent of duties to be performed by the spouse; (3) the care rendered by the spouse must be of the type usually rendered only by trained attendants and beyond the scope of normal household duties; and (4) there is a means to determine with proper certainty the reasonable value of the services performed by the spouse."
Warren Trucking Co. v. Chandler, 221 Va. 1108, 277 S.E.2d 488 (1981);Kenbridge Const. Co. v. Poole, 25 Va. App. 115, 486 S.E.2d 567 (1997); see also In Re Klapacs's Case, 355 Mass. 46, 242 N.E.2d 862 (1968); Rossv. Northern States Power Co., 442 N.W.2d 296 (Minn. 1989); Larson v.Squire Shops, 228 Mont. 377, 742 P.2d 1003 (1987); St. Clair v. County ofGrant, 110 N.M. 543, 797 P.2d 993 (N.M.Ct.App. 1990). Services which primarily consist of prompting or giving "verbal cues" are not compensable medical services or treatment. See Little Rock Convention and VisitorsBureau, 60 Ark. App. 82, 959 S.W.2d 415 (1997); Warren Trucking Co. v.Chandler, supra. The determination of whether attendant care is compensable medical treatment is generally a question of fact. Alexanderv. LaLonde Enterprises, 288 N.W.2d 18 (Minn. 1980); see London v SnakTime Catering, 136 N.C. App. 473, 525 S.E.2d 203 (2000). As explained in the foregoing Findings of Fact, the prompting and verbal cues recommended by Dr. Fozdar are not "treatment" within the contemplation of the Act.
4. Plaintiff's compensation rate is $421.10 per week, and defendant is entitled to reduce weekly benefits to this amount effective upon the filing of this Opinion and Award.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay indemnity at the rate of $421.10 weekly.
2. Plaintiff's claim for attendant care is DENIED.
3. Defendant shall pay expert witness fees in the amounts of $240.00 to Dr. John P. Gorecki, $180.00 to Dr. Thomas Gualtieri, and $90.00 to Carol Harris. In all other respects, the parties shall pay their own costs.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
DISSENTING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
RCR/gas