**PAFFORD MEDICAL BILLING SER-VICES, INC., and Firstcomp Insurance Co., Appellants**

v.

**Tammy R. SMITH, Appellee.**

**No. CA 10–1134.**

Court of Appeals of Arkansas.

March 2, 2011.

922

Randy Phillip Murphy, Mark D. Wankum, Little Rock, for appellants.

Steven R. McNeely, Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Pafford Medical Billing Services, Inc., appeals from the Workers' Compensation Commission's order affirming and adopting the Administrative Law Judge's decision, finding that appellee Tammy Smith had proven by a preponderance of the evidence that she sustained a compensable left-elbow injury and awarding her related benefits. Pafford argues on appeal that substantial evidence does not support the Commission's findings (1) that Smith suffered a compensable injury and is therefore entitled to medical treatment and temporary total disability benefits (TTD); (2) that her motor vehicle accident was not a nonwork-related independent intervening cause of subsequent medical treatment; and (3) as to the calculation of her average weekly wage. We affirm.

At the time of her injury, Smith was employed by Pafford as a billing assistant. According to Smith's testimony, in early March 2009, while she was at work, she pulled a heavy bag of paper out of a box in preparation for the paper to be shredded by the "Shred–It" company. Smith stated, "all I did was move the bag" and "pull it to pull it out of the way, and I just felt something in my elbow." She could not remember the exact date of the incident but knew that it was early March, around March 6, and that it was on Friday, as Shred–It only comes on every other Friday. Smith continued to work the rest of the day and did not report it to her supervisors, as she did not think it was "any big deal" and only thought that she had strained a muscle in her elbow. She testified that she did mention it to a co-worker, Sharon Chandler, who worked across the hall from Smith, when she joked to Chandler that she "was trying to take [herself] out that day." Chandler testified that she did not remember Smith making this statement.

After she continued to have pain in her elbow, Smith testified that she first sought treatment from Dr. Ronald Rush on March 18, 2009, who noted in the medical report that Smith was there for pain in her left elbow that started approximately three weeks earlier when she was "changing a

shredit bag." Dr. Rush stated in the history section that Smith had sharp pain, swelling, and discomfort radiating from the elbow to thumb and that the symptoms had been waxing and waning for three weeks depending on how Smith used her arm. His examination noted findings of "tenderness to lateral side of left elbow over the lateral epicondyle" and "tenderness with wrist rotation against resistance." Dr. Rush diagnosed Smith with "left lateral epicondylitis," which is also known as tennis elbow, and prescribed a brace, along with medication for the pain and swelling. Dr. Rush released Smith to return to work on March 23, 2009, although his medical report stated that she was to avoid lifting or twisting with her left arm for two to three weeks.

On March 31, 2009, Smith sought emergency medical treatment after her symptoms continued to worsen. An x-ray of the elbow showed no acute pathology, and Dr. Shanna Spence also diagnosed Smith with lateral epicondylitis. Dr. Spence administered a steroid injection of Smith's elbow at this time and released her to return to work with no restrictions on April 2, 2009. Smith then sought treatment with Dr. Douglas Thompson on April 7, after suffering increasing pain when lifting her left shoulder. Dr. Thompson's notes indicate full range of motion and "exquisite tenderness" over the left lateral epicondyle. He recommended that Smith give the steroid injection more time to work and that she rest the elbow and not lift anything more than one pound. At a follow-up appointment on April 28, Dr. Thompson noted that Smith still had tenderness in the left lateral area of her elbow, and he referred her to an orthopaedic surgeon for an unrelated finger deformity, as well as to consider a possible "lateral epicondylectomy" in the elbow. Dr. Thompson also wrote an out-of-work slip stating that Smith was under his care from March 28, 2009, through April 28, 2009, and that she was released to return to work on May 4, 2009.

On May 11, 2009, Smith saw Dr. Thomas Frazier, an orthopaedic surgeon, who wrote that Smith had an "acute onset of lateral elbow pain in March 2009, when she was moving a box of documents to be shredded." Dr. Frazier noted tenderness localized to the lateral epicondyle and gave Smith another injection in her elbow. When the second injection failed to improve Smith's symptoms, she returned to see Dr. Thompson, who noted in his report dated May 26, 2009, that Smith stated that she had been terminated from her job due to her elbow problems. After discussing her options, Dr. Thompson stated that Smith's pain was so severe that she wanted to undergo a left lateral epicondylectomy, debridement, and reattachment. This surgery was performed on June 22, 2009, and the operative report states that Smith's extensor muscles were elevated off the left lateral epicondyle, which was then debrided. Dr. Thompson noted that there was "significantly hard cortalized bone on the entire left lateral epicondyle" and that he debrided this "down to good cancellous bleeding bone and then repaired the extensor muscle tendon back to the lateral epicondyle."

Dr. Thompson's reports from Smith's follow-up appointments indicate that she initially improved post-surgery. At her visit on August 13, 2009, Dr. Thompson noted that Smith had minimal tenderness and some medial swelling, and he started her on some strengthening and gripping exercises. However, in September 2009, Dr. Thompson testified that he noticed a small gap developing between the lateral epicondyle and the extensor muscle mass. He was concerned that the repair was starting to "pull apart" at this time. Several weeks after that, Dr. Thompson testified that Smith was having increasing pain

and that she started having a knot at the lateral epicondyle site. Smith related to him that she had hit a deer with her vehicle just prior to that time and that she had been gripping the steering wheel tightly. By her next visit on October 23, 2009, Dr. Thompson testified that Smith's elbow was becoming unstable, that the extensor tendon repair had obviously failed at that point, and that he needed to do another surgery to reconstruct the ligaments.

The second surgery was performed on October 26, 2009. Dr. Thompson testified that he reattached the extensor muscle mass and found that Smith had also ruptured the lateral collateral ligament. He explained that this was a different ligament than was part of the original repair and that it may have happened when Smith hit the deer. According to Dr. Thompson, if the lateral epicondyle repair from the first surgery had failed, the lack of support from the extensor muscle mass could have contributed to the collateral ligament rupture. Dr. Thompson stated in his report from November 2009 that from a proximate-cause standpoint, "the first event could be attributed to the cause of the second event and the need for the revision surgery and continued long term problems with her elbow." At the hearing, Dr. Thompson testified that Smith was still recovering from the second surgery and that it would take another three months before she could even be put on restricted work duty.

Smith filed a petition with the Commission, seeking reimbursement for her medical treatment and TTD benefits from her last day working at Pafford, which was March 27, 2009, until a date yet to be determined. After the December 2009 hearing, the ALJ found that Smith had proven by a preponderance of the evidence that she sustained a compensable elbow injury, that she was entitled to all reasonably necessary medical treatment, including both surgeries, and that she was entitled to TTD benefits. The Commission affirmed and adopted the ALJ's decision.

On appeal, Pafford argues that substantial evidence does not support the Commission's decision that Smith suffered a compensable injury and is therefore entitled to medical treatment and TTD benefits. When reviewing a decision of the Workers' Compensation Commission, this court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission. *Evans v. Bemis Co.*, 2010 Ark. App. 65, 374 S.W.3d 51. This court must affirm the decision of the Commission if it is supported by substantial evidence. *Id.* Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion of the Commission. *Id.* We only reverse the Commission's decision if we are convinced that fair-minded persons could not have reached the same conclusion with the same facts before them. *Id.* Questions regarding the credibility of witnesses and the weight to be given their testimony are within the exclusive province of the Commission. *Id.* Typically, this court reviews only the decision of the Commission, not that of the ALJ; however, where the Commission adopts the ALJ's opinion, we consider both the ALJ's order and the Commission's order. *Id.*

To prove the occurrence of a specific-incident compensable injury, the claimant must establish by a preponderance of the evidence (1) that an injury occurred arising out of and in the scope of employment; (2) that the injury caused internal or external harm to the body which required medical services or resulted in disability or death; (3) that the injury is established by medical evidence supported

by objective findings, as defined in Ark. Code Ann. § 11–9–102(16); and (4) that the injury was caused by a specific incident and is identifiable by time and place of occurrence. Ark.Code Ann. § 11–9–102(4)(A)(i) (Supp.2009).

■ Pafford first contends that Smith failed to prove a specific-incident compensable injury because she did not prove that her injury was identifiable by time and place of occurrence. As Pafford admits in its argument, it is not necessary for a claimant to identify the precise time |₇and numerical date upon which an accidental injury occurred. *Edens v. Superior Marble & Glass*, 346 Ark. 487, 58 S.W.3d 369 (2001). Rather, the claimant must only prove that the occurrence of the injury is capable of being identified, and a claimant's inability to specify the exact date may be considered by the Commission in weighing her credibility. *Id.*

■ In this case, Smith could not identify the exact date of her elbow injury; rather, she testified that it was in early March 2009, around March 6, and that it was on a Friday because Shred–It comes every other Friday afternoon. Smith stated that she hurt her elbow when she was pulling a bag of papers to be shredded out of the box in preparation for Shred–It's arrival. Smith testified that she did not report the incident that day or seek immediate medical treatment because she did not think it was "any big deal" initially and thought that she had only strained a muscle. Although Pafford argues that the only evidence with regard to the incident came from Smith's "vague and uncorroborated" testimony, the ALJ specifically found Smith to be "an extremely credible witness." The ALJ further noted that Smith's testimony as to the occurrence and cause of her injury were corroborated by the medical evidence, all of which indicated that she hurt her elbow in early March,

while pulling a heavy bag of paper. The matter of Smith's credibility was exclusively for the ALJ and the Commission to decide, and there is no merit to Pafford's argument that Smith failed to meet her burden of proof on this point.

■ Pafford next argues that there were no objective findings of Smith's elbow injury. According to Ark.Code Ann. § 11–9–102(4)(D), a compensable injury must be established by medical evidence supported by objective findings. "Objective findings" are those findings |₈that cannot come under the voluntary control of the patient. Ark.Code Ann. § 11–9–102(16)(A)(i). Complaints of pain and muscle tenderness are not considered objective findings under the statute. *Kimbrell v. Ark. Dep't of Health*, 66 Ark. App. 245, 989 S.W.2d 570 (1999). Pafford contends that there were no objective findings of Smith's elbow injury other than the medical reports noting tenderness. While Smith asserts that the report from her initial visit with Dr. Rush on March 18, 2009, noted "swelling" in the interim history section of the report and also indicated that she was prescribed Naprosyn for "inflammation and swelling," Pafford argues that this is not sufficient because it was based upon Smith's own report of her symptoms, not on the medical examination. This may be true; however, there were objective findings of the injury noted in the operative report after Smith underwent a "lateral epicondylectomy, debridement, and reattachment" surgery. This report indicates that Dr. Thompson found "tendinosus" and "significantly hard cortalized bone on the entire left lateral epicondyle" that was then "debrided down to good cancellous bleeding bone." These findings during the surgical procedure are objective findings that were not under Smith's voluntary control. *Wal–Mart Stores, Inc. v. Van Wagner*, 337 Ark. 443, 990 S.W.2d 522 (1999). Dr.

Thompson further stated that it was his medical opinion that her injury was "greater than 51% caused by her initial injury at work and failed conservative treatment necessitating surgical repair." Thus, there was substantial evidence to support the Commission's decision that Smith had proven a compensable specific-incident injury to her left elbow and that she was entitled to all reasonably necessary medical treatment related to this injury.

Pafford also argues that Smith was not entitled to TTD benefits because she did not prove that she was totally incapacitated from earning wages as a result of her elbow injury. For a claimant to be entitled to TTD, she must show that she is within the healing period and that she suffered from a total incapacity to earn wages. *Hickman v. Kellogg, Brown & Root,* 372 Ark. 501, 277 S.W.3d 591 (2008). The healing period ends when the employee is as far restored as the permanent nature of her injury will permit and nothing in the way of further treatment will improve her condition. *Id.*

Pafford contends that Smith performed her normal work duties until she finally reported the injury on April 7, 2009, and that her physicians repeatedly released her to work with no restrictions throughout March, April, and May 2009. It is undisputed that Smith did not return to work after March 27, 2009. While noting that there were return-to-work slips in the record, the ALJ stated in its decision that it found Smith's testimony that she was unable to work after this date to be credible and supported by the medical evidence. Smith testified that she had told her doctors that she needed to work and that they wrote her return-to-work slips, but she stated that she did not feel she could work with her symptoms. Smith also testified that her supervisor, Oswold, told her to take whatever time she needed for her

injury to heal and that she should not come back to work until she was fully released from her doctor. Therefore, substantial evidence supports the Commission's decision that Smith was entitled to TTD from March 27, 2009, until a date yet to be determined.

Pafford contends in its second point on appeal that, even if substantial evidence supports the Commission's finding that Smith sustained a compensable left-elbow injury, her subsequent motor-vehicle accident constituted a nonwork-related, independent intervening cause that extinguished any subsequent liability on its part. According to Ark.Code Ann. § 11–9–102(4)(F)(iii), benefits "shall not be payable for a condition which results from a nonwork-related independent intervening cause following a compensable injury which causes or prolongs disability or need for treatment." This nonwork-related independent intervening cause does not require negligence or recklessness on the part of the claimant. *Id.*

In support of its argument, Pafford notes the medical evidence that Smith was gradually improving after the first surgery in June 2009 and that Smith told Dr. Thompson that she felt her surgical repair had ruptured when she gripped the steering wheel tightly when her vehicle hit a deer sometime later that summer. Pafford further cites Dr. Thompson's report that this event also likely led to the rupture of the lateral collateral ligament at the same time and argues that the second surgery in October 2009 was necessitated by this additional, more severe injury and was causally distinct from any compensable injury sustained in March 2009. Referring to the ALJ's decision, which stated that Smith's motor-vehicle accident caused her to "reinjure her left elbow" and that as a result, she "had to undergo a second left elbow surgery," Pafford argues that the

ALJ only found Smith's accident was not an independent intervening cause because her conduct was not unreasonable and that this conclusion is an erroneous interpretation of the statute.

Our supreme court interpreted Ark. Code Ann. § 11–9–102(4)(F)(iii) in *Davis v. Old Dominion Freight Line, Inc.*, 341 Ark. 751, 20 S.W.3d 326 (2000). In *Davis*, the court held that the statutory amendment adding the language that an independent intervening cause does not require negligence or recklessness on the part of the claimant did not modify prior case law, but rather was a codification of prior case law, including *Guidry v. J. & R. Eads Constr. Co.*, 11 Ark. App. 219, 669 S.W.2d 483 (1984). *Id.* In *Guidry*, this court stated that if there is a causal connection between a primary compensable injury and the subsequent disability, there is no independent intervening cause unless the subsequent disability is triggered by activity of the claimant that is unreasonable under the circumstances.

Despite Pafford's disagreement with the holding in *Davis, supra,* our supreme court's interpretation of the statute is controlling, and as the ALJ found, Smith's conduct was not unreasonable in this case. She was not at any time restricted from driving by her physician. Although Pafford also seems to contend that the injuries caused by Smith's accident were not causally connected to her initial compensable injury, there is ample medical evidence to the contrary. Dr. Thompson testified that he became concerned that Smith's surgical repair was starting to fail at her visit on September 17, when he noticed a small gap developing between the lateral epicondyle and the extensor muscle mass. By her next visit, Dr. Thompson testified that there was increasing pain and a bigger gap on the lateral aspect of her elbow, and he stated that at this visit, Smith informed him that she had hit a deer. Although Smith did rupture an additional ligament that was repaired during the second surgery, in addition to the re-repair of the extensor muscle mass that had failed, Dr. Thompson stated that the extensor muscles give support to the lateral collateral ligament, such that any kind of traumatic injury would cause that to rupture once the extensor muscles failed. He further stated in his report that "the first event could be attributed to the cause of the second event and the need for the revision surgery and continued long term problems with her elbow." Thus, there was substantial evidence to support the Commission's decision that Smith's motor-vehicle accident was not an independent intervening cause precluding further liability on the part of Pafford.

For its third point on appeal, Pafford argues that substantial evidence does not support the Commission's calculation of Smith's average weekly wage. Arkansas Code Annotated section 11–9–518(a) (Supp. 2009) explains how to calculate a claimant's average weekly wage and provides as follows:

(a)(1) Compensation shall be computed on the average weekly wage earned by the employee under the contract of hire enforced at the time of the accident and in no case shall be computed on less than a full-time workweek in the employment.

(2) Where the injured employee was working on a piece basis, the average weekly wage shall be determined by dividing the earnings of the employee by the number of hours work required to earn the wages during the period not to exceed fifty-two (52) weeks preceding the week in which the accident occurred and by multiplying this hourly wage by the number of hours in a full-time workweek in the employment.

The ALJ found that Smith's average weekly wage was $340 based upon the claimant's testimony that she made $8.50 per hour and that she was hired to work a 40–hour week. Although Pafford initially stipulated to this amount, at the hearing, it argued that its wage records showed that Smith had been working less than 40 hours per week prior to her injury, and the ALJ allowed Pafford to withdraw its stipulation. These wage records, which were introduced at the hearing, were from April 1, 2008, through April 1, 2009.

Pafford contends that the Commission ignored the wage records entered into evidence in making its determination. This argument is without merit. In the ALJ's decision awarding Smith $340 as her average weekly wage, he noted that Smith had stopped working due to her injury on March 27, 2009, and that the evidence showed that she had sought medical treatment prior to that date as well. Thus, the ALJ found that Pafford's wage records did not accurately reflect Smith's periods of employment and that, because the wage records were not broken down in any manner, it would be speculation for him to determine her weekly wages from these records. Stating that the best evidence of Smith's average weekly wage was her own credible testimony, the ALJ then found that she was entitled to an average weekly wage of $340 per week. Thus, substantial evidence also supports the Commission's calculation of Smith's average weekly wage.

Affirmed.

GLOVER and ABRAMSON, JJ., agree.