

# ARKANSAS COURT OF APPEALS

DIVISIONS I & IV
**No.** CV-13-273

| | |
|---|---|
| FIRESTONE BUILDING PRODUCTS and SEDGWICK CMS | **Opinion Delivered** October 30, 2013 |
| APPELLANTS | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G008511 ] |
| V. | |
| PAMELA V. HOPSON | |
| APPELLEE | AFFIRMED |

### RITA W. GRUBER, Judge

Firestone Building Products and Sedgwick CMS (collectively, Firestone) appeal a decision of the Arkansas Workers' Compensation Commission regarding Pamela V. Hopson's falls in the workplace on September 22, 2010. Firestone contends that (1) substantial evidence does not support the Commission's decision that Hopson sustained a compensable injury, (2) neither the law nor substantial evidence supports the thirty-five-percent and thirty-two-percent impairment ratings assigned by the Commission, and (3) neither the law nor substantial evidence supports the Commission's award of medical treatment for the injury. We disagree and affirm.

Where the sufficiency of the evidence is challenged on appeal, we review the evidence in the light most favorable to the findings of the Commission and will affirm if those findings are supported by substantial evidence. *LVL, Inc. v. Ragsdale*, 2011 Ark. App. 144, 381 S.W.3d 869. Substantial evidence is relevant evidence that a reasonable mind might accept

SLIP OPINION

as adequate to support a conclusion. *Id*. We will not reverse a finding based upon the Commission's exercising its duty to determine credibility and to interpret conflicting evidence. *Id*.

## I. *Compensability*

The claimant bears the burden of proving that her injury was the result of an accident that arose in the course of employment and that the accident grew out of, or resulted from, the employment. *Delaplaine Farm Ctr. v. Crafton*, 2011 Ark. App. 202, 382 S.W.3d 689. The appellate court views the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Commission's findings. *Cedar Chem. Co. v. Knight*, 372 Ark. 233, 273 S.W.3d 473 (2008).

An employer takes the employee as it finds her, and employment circumstances that aggravate preexisting conditions are compensable. *Heritage Baptist Temple v. Robison*, 82 Ark. App. 460, 464, 120 S.W.3d 150, 152 (2003). An aggravation is a new injury resulting from an independent incident, and the aggravation of a preexisting, noncompensable condition by a compensable injury is, itself, compensable. *Williams v. L & W Janitorial, Inc.*, 85 Ark. App. 1, 9, 145 S.W.3d 383, 388 (2004).

In *ERC Contractor Yard & Sales v. Robertson*, 335 Ark. 63, 71, 977 S.W.2d 212, 216 (1998), our supreme court discussed the compensability of idiopathic falls in the workplace:

> An idiopathic fall is one whose cause is personal in nature, or peculiar to the individual. 1 Larson, *Workers Compensation Law*, § 12.11 (1998); [other citations omitted]. Because an idiopathic fall is not related to employment, it is generally not compensable unless conditions related to employment contribute to the risk by placing the employee in a position which increases the dangerous effect of the fall. Larson, *supra*.

2



When a truly unexplained fall occurs while the employee is on the job and performing the duties of his employment, the injury resulting therefrom is compensable. *Delaplaine*, *supra*.

In an interview by Firestone's insurance carrier, Hopkins explained that her work entailed helping fold rubber that was machine-poured and pulling sheets of it up a ramp from the floor. She said that at 6:00 a.m. on September 22, 2010—after sitting on a ramp and cutting tape off rollers—she stepped down, twisted off balance, and fell: "my right leg went to turn around, and my head was facing in one direction and my back was facing another direction. So when I got up, I had to make a pivot turn to the right, take my right leg over, and stepped down." She said that a coworker who heard her call for help sent two men over; she told them she could not move because her leg was hurt; they placed her in a wheelchair; and they took her to first aid, where an ice pack was put on her knee and her blood pressure was taken. She denied having pain or trouble with her knee before the fall, and she said that she had taken her blood-pressure medication and ibuprofen before going to work that night. She stated that a doctor had previously treated arthritis in her ankle with medication; that she had undergone surgery for a uterine hemorrhage; and that two weeks before her fall, she had been kept off work because of high blood pressure.

In the interview, Ms. Hopson related the following events that occurred after she sat in the wheelchair. She stood from the wheelchair to go to the bathroom, putting weight on her "other leg," and fell a second time. She was asked if she could "make it out" to go home, and she said she would try to walk: "Bruce Yelverton [from management] grabbed my hand, a supervisor got behind me, and they helped me walk out of first aid. But, when we were

3



outside of first aid, I fell again because my legs wouldn't hold me up." She explained that she did not have strength in her right leg when she fell the second time and that she fell on both knees during the third fall, with her left leg feeling "tender." She stated that she went to her family doctor at 11:30 a.m. that morning; he x-rayed her knees and told her that nothing was broken.

In testimony before the administrative law judge, Hopson again described her three falls—hitting her right foot stepping off the ramp and landing on her right knee, falling forward onto her right knee when she stood to go to the bathroom and put her weight on the left, and falling on her left leg when her legs gave out in the parking lot. She again explained that the first fall occurred when she was taking tape off rollers near a ramp:

> I stood up and I began to step down, turning to my left, and my one shoe was already down close to the floor and . . . I was stepping down and bringing my right leg over. That's when my safety shoe . . . hit the bar that's on the floor and I lost my balance and went down. There is a metal bar between the ramp and the roller. As I stepped down off the ramp, my right foot, hit that piece of metal bar, I went off balance and hit the floor. When I fell I landed on my right knee, and I could not get back up.

Hopson testified that Danny Glass came to Dr. Fox's office when she was there the morning of her falls and told her, after talking to Bruce Yelverton by telephone, that "workers' compensation would not pay for this." She testified that she had been noncompliant about taking her blood-pressure medication over the years but had taken it the morning of the accident. She denied telling Dr. Fox that she was out of medication, denied telling Yelverton she had taken strong pain medication that day, and said that Dr. Fox's report on the day of her falls that she had taken hydrocodone the last two days was "a mistake." She testified that she had been concerned about her obesity impacting her ability to do her work,

4

SLIP OPINION

that she had long-time problems with her wrists and arms, and that her osteoarthritis had not affected her knees. She explained that a "Dr. Bennet"[1] at Dr. Fox's office told her the injury was not work related and had checked "no" on Firestone's accident-and-sickness forms to indicate that her injury was not related to work. Hopson knew the checkmark had been made on the October 10, 2012 form, which she "felt was incorrect," but she signed and submitted it anyway. She also testified that Danny Glass's secretary told her that she "would have to pay back all that money" she had received if she "didn't fill out the box *no* on those accident and sickness status forms."

Dwight Dixon, a Firestone sealing-tape manager and Hopson's supervisor, testified that he could not recall anyone else tripping or falling at the ramp as Hopson had done. He described her falls in the first-aid room and parking lot, which he witnessed, as slow-motion falls onto her backside that did not seem real, and he said that her knees did not impact anything. Bruce Yelverton testified that Hopson's blood pressure in the first-aid office was 180/90 and that she told him she was out of her medication and had recently taken relatively strong pain medicine. He described her fall when she stood to go to the bathroom as a slow-motion collapse onto her buttocks, rolling to the right side, with no visible knee impact. He described the fall when she attempted to leave for the parking lot—while he supported her on the right—as a collapse to the left in which she slid down the wall and he attempted to pin her against it, but she landed on her buttocks. Hopson testified on rebuttal testimony that the

---

[1]The Commission's decision states that Jakeeli Bennett was Dr. Fox's nurse practitioner.

SLIP OPINION

two men's descriptions of her falls were unfair, particularly of Yelverton's holding her against the wall. She said, "I went down, bam. He couldn't even hold me and it wasn't no catching, I went down. I landed on my knees."

A radiology report correlated October 18, 2010 x-rays of Hopson's knees with her bilateral MRIs of October 20, 2010:

> Complete tear of [right-knee] distal quadriceps tendon near the musculotendinous junction with inferior positioning of the patella and serpiginous folding of the quadriceps tendon in the suprapatellar space associated with a small calcification on radiograph which may be within the tendon. Left knee MRI of the same day also shows a distal quadriceps tendon tear, and bilateral tears are often associated with systemic disease including hyperparathyroidism, chronic renal failure, diabetes, rheumatoid arthritis, gout, or with history of steroid use/injections.

On January 7, 2011, Dr. Johannes Gruenwald surgically repaired quadriceps tendons in Hopson's knees. He wrote in a September 27, 2011 letter that she "sustained work related injuries to her bilateral lower-extremity injuries as a result of a fall" and that the injuries—"disruption of the bilateral extensor mechanism to the lower extremity consisting of quadriceps tears"—were ultimately treated with open repairs. The letter continues:

> Please note that during the repair . . . there was no indication of a chronic tear, we clearly found fresh tears to her bilateral lower extremities which were consistent with the history provided by Ms. Hopson.
> Unfortunately, Ms. Hopson was unable to complete her physical therapy; we firmly believe that physical [sic] would be beneficial even at this late stage to maximize her best possible outcome.
> There is no indication that arthritic joint pain and acute quadriceps tears have any positive connection.
> At this time, we believe that Ms. Hopson has reached maximum medical improvement.

Applying the AMA Guides to the Evaluation of Permanent Impairment (4th ed.), Dr. Gruenwald assigned disability ratings of thirty-five percent for the right lower extremity and

6

thirty-two percent for the left lower extremity.

Firestone contends that substantial evidence does not support the decision that Hopson sustained a compensable injury. Firestone argues that Hopson had preexisting conditions in her knees that led to her knee problems in the workplace, and that the initial incident was an idiopathic fall caused by not taking her blood-pressure medication and by taking hydrocodone. Firestone complains that there were inconsistencies in Dr. Gruenwald's deposition testimony and letter of September 2011 concerning Hopson's impairment ratings and chronic versus fresh bilateral quadriceps-tendon tears, and that he incorrectly reported the mechanics of Hopson's fall by stating that she fell forward and hit both kneecaps at once. Firestone complains that Hopson gave varied versions of her three falls; that in seeking medical treatment, she repeatedly stated that this was not a workers' compensation incident; that she refused to be tested for a possible systematic disease despite four doctors' concerns; and that on accident-and-sick forms, in order to receive her short-term disability, she answered "no" to the question of whether the injury was due to employment. Firestone concludes that the injury did not arise out of Hopson's employment but was personal to her.

The Commission, adopting and affirming the decision of the law judge, rejected these arguments:

> Even if the claimant had preexisting conditions, a finding which I do not make, the claimant's falls on September 22, 2010, aggravated any alleged preexisting condition thereby creating compensable injuries in and of themselves. . . . [N]othing in the record reflects that the claimant ever had a history of fainting or falling due to either preexisting conditions, lack of blood pressure medication, or for taking pain medication. To buy into the respondents' argument of an idiopathic fall would be to engage in speculation and conjecture . . . .



The compensability of Hopson's injury turned on credibility determinations and resolution of testimony. There was substantial evidence from which the Commission could have found that Hopson's falls were work-related; did not result from preexisting conditions, pain medication or lack of blood-pressure medication; and were not idiopathic falls.

## II. *Impairment Rating*

Any determination of the existence or extent of physical impairment must be supported by objective and measurable findings. Ark. Code Ann. § 11-9-704(c)(1)(B) (Repl. 2012). The Commission has adopted the American Medical Association Guides to the Evaluation of Permanent Impairment (4th ed. 1993) to be used in the assessment of anatomical impairment. *Avaya v. Bryant*, 82 Ark. App. 273, 105 S.W.3d 811; *see* Ark. Code Ann. § 11-9-522(g)(1)(A) (Repl. 2012). Under Arkansas Code Annotated section 11-9-102(4)(F)(ii) (Repl. 2012):

> (a) Permanent benefits shall be awarded only upon a determination that the compensable injury was the major cause of the disability or impairment.
>
> (b) If any compensable injury combines with a preexisting disease or condition or the natural process of aging to cause or prolong disability or a need for treatment, permanent benefits shall be payable for the resultant condition only if the compensable injury is the major cause of the permanent disability or need for treatment.

The major-cause requirement is satisfied where a compensable injury aggravates an asymptomatic preexisting condition such that the condition becomes symptomatic and requires treatment. *Wright v. St. Vincent Doctors Hosp. Indem. Ins. Co. of N. Am.*, 2012 Ark. App. 153, 390 S.W.3d 779.

Firestone argues that Hopson failed to prove that the major cause of her disability or

impairment was her workplace fall as opposed to systemic disease or other preexisting condition and that she refused to be tested for diseases that could have caused her injury. It also argues that Dr. Gruenwald's medical opinion of impairment is theoretical because he admitted the reference in his letter to "fresh tears" should have been "chronic" and was based on Hopson's subjective history of how the injury occurred. It complains that Dr. Gruenwald "loosely" referenced the AMA Guidelines and testified that he could not rule out systemic disease.

The Commission is authorized to decide which portions of the medical evidence to credit and to translate this evidence into a finding of permanent impairment using the AMA Guides; thus, the Commission may assess its own impairment rating rather than rely solely on its determination of the validity of ratings assigned by physicians. *Id.* The Guides are just that: mere guides to aid the Commission in assessing the degree of a claimant's disability as defined by statute and interpreted by the courts. *Singleton v. City of Pine Bluff*, 102 Ark. App. 305, 285 S.W.3d 253 (2008). In *Wayne Smith Trucking, Inc. v. McWilliams*, 2011 Ark. App. 414, 384 S.W.3d 561, we noted our holding in *Wal-Mart Assocs., Inc. v. Ealey*, 2009 Ark. App. 680, that in addressing an impairment rating, there is no requirement that medical testimony be based solely or expressly on objective findings, only that the medical evidence of the injury and impairment be supported by objective findings.

Here, MRIs of Hopson's left and right knees showed bilateral quadriceps tendon tears. Dr. Gruenwald, after surgically repairing the tears, wrote in his September 27, 2011 letter: "According to Fourth Edition, AMA Guidelines this impairment rating is based on limitations

SLIP OPINION

as a result of her work-related injuries. Ms. Hopson has disability rating for the right lower extremity of 35% and 32% to the left lower extremity." The Commission found the ratings in accord with the AMA Guidelines, accepted the ratings, and found that Hopson had proved her compensable bilateral knee injuries to be the major cause of impairment. On this basis, the Commission awarded the impairment ratings that Dr. Gruenwald had assigned.

The Commission exercised its duty to assess the medical evidence to make a finding of permanent impairment, using the opinion of Dr. Gruenwald and guidance of the AMA Guide to assess the degree of disability. Substantial evidence thus supports the Commission's decision on this issue, and we affirm.

### III. *Medical Treatment*

Arkansas Code Annotated section 11-9-508(a) (Repl. 2012) requires an employer to promptly provide an injured worker such medical and surgical treatment "as may be reasonably necessary in connection with the injury received by the employee." What constitutes reasonably necessary treatment is a question of fact for the Commission, which has the duty to use its expertise to determine the soundness of medical evidence and to translate it into findings of fact. *Hamilton v. Gregory Trucking*, 90 Ark. App. 248, 205 S.W.3d 181 (2005).

Firestone argues that the basis of Dr. Gruenwald's opinion that the surgery was related to falls at work was inaccurate. It also argues that there is no evidence showing that expenses for Hopson's "incurred and recommended medical treatments" were for a compensable injury as opposed to a preexisting condition, calcification from a prior infection, misuse of

medications, or a systemic disease. The Commission rejected these arguments when deciding the issue of compensability, and it necessarily follows that the arguments fail to support Firestone's challenge to medical treatment for the compensable injury.

Affirmed.

PITTMAN, VAUGHT, and WOOD, JJ., agree.

WALMSLEY and HIXSON, JJ., dissent.

**BILL H. WALMSLEY, Judge, dissenting.** I agree with Judge Hixson that there is no substantial evidence to support the Commission's findings when considering the inconsistencies in the evidence. I write separately to specifically note the lack of substantial evidence proving the compensability of Hopson's left knee injury.

To prove the occurrence of a specific-incident compensable injury, the claimant must establish by a preponderance of the evidence (1) that an injury occurred arising out of and in the scope of employment; (2) that the injury caused internal or external harm to the body which required medical services or resulted in disability or death; (3) that the injury is established by medical evidence supported by objective findings; and (4) that the injury was caused by a specific incident and is identifiable by time and place of occurrence. *Pafford Med. Billing Servs., Inc. v. Smith*, 2011 Ark. App. 180, at 6, 381 S.W.3d 921, 925–26 (citing Ark. Code Ann. § 11-9-102(4)(A)(i) (Supp. 2009)).

At the hearing, Hopson testified that her left knee was not injured until the third fall, which occurred outside the first-aid room as Bruce Yelverton was helping her to the parking lot. She said that her legs gave out and she fell on her left leg. In her interview with the

11



workers' compensation carrier, Hopson stated that she fell down on both knees during the third fall. Dwight Dixon, a manager at Firestone, testified that Hopson's third fall was a slow-motion slide down the wall, that she did not hit her knees, and that she landed on her buttocks. He said that her fall did not look real. Dixon's testimony was not mentioned by the administrative law judge. The ALJ also discounted Yelverton's testimony as vague and akin to a medical opinion, which he was not allowed to give. Yelverton testified that, as he was on her right side supporting her, Hopson collapsed to the left side and ended up on her buttocks. He said that while her knee may have touched the wall, her knee did not strike the wall or the floor. Yelverton said that Hopson's fall was a slow-motion collapse as if she was trying to sit on the floor. He said that her entire body went limp and that she did not help get herself back into the wheelchair.

The alleged accidental fall that supposedly caused Hopson's left knee injury was witnessed by two others who contradicted her claims. Hopson's own description of the third fall changed. A workers' compensation claimant bears the burden of proving that his injury was the result of an accident that arose in the course of his employment, and that it grew out of, or resulted from the employment. *Whitten v. Edward Trucking/Corp. Solutions*, 87 Ark. App. 112, 117, 189 S.W.3d 82, 85 (2004). "Arising out of the employment" refers to the origin or cause of the accident, while "in the course of the employment" refers to the time, place, and circumstances under which the injury occurred. *Id.* When considering these facts and the medical evidence, I do not think that there is substantial evidence that Hopson met her burden of proving that her left knee injury arose out of her employment.

**KENNETH S. HIXON, Judge, dissenting.** I am mindful of our standard of review in workers' compensation cases. However, I am equally mindful that our standard of review does not insulate the Commission from judicial review nor renders our function in these cases meaningless, and that we will reverse the award of benefits when we are convinced that fair-minded persons could not have reached the same conclusion arrived at by the Commission. In my view, this is one of those cases.

*Introduction*

The claimant is 5'2" and weighs 255 pounds. She has pre-existing medical conditions including, but not limited to, bilateral carpel tunnel syndrome, morbid obesity, depressive disorder, pain in multiple joints, and osteoarthritis. Over the past three years, her work history revealed a pattern of working two or three weeks at a time and then taking several months off for various medical issues or disability. Then, the claimant returns to work and repeats the pattern. That pattern is the source of this claim. The testimony revealed that the claimant worked for the employer for two weeks and then took off for a surgery. After several months off work, she returned for two weeks and then took off as a result of bilateral carpel tunnel syndrome. The claimant filed for social security disability benefits and was denied. After several months and after her social security disability benefits were denied, the claimant returned to work for two more weeks and allegedly sustained an unwitnessed fall at work so severe that it ruptured tendons in each of her knees. The unwitnessed fall was followed up later by two additional "falls" witnessed by other employees as described below.

Shortly after the falls, the claimant's husband took her to see her personal physician and



she gave her physician a history and description of the falls. Her personal physician's report states: "*She was sitting on a ramp and stood up. She took two steps and said her knee twisted and gave way. She said she did not trip on anything. . . . She says she took some leftover hydrocodone the past two days for hand pain. She has been out of her blood pressure medication.*"

As a result of the falls and her knee injuries, the claimant filed a claim for non-work-related short-term disability benefits. To apply for the non-work-related benefits, the claimant had to prepare and sign an Accident/Sickness Status Report form. The form contained a simple unambiguous question: *"IS THIS SICKNESS OR INJURY DUE IN ANY WAY TO YOUR EMPLOYMENT? IF 'YES' GIVE FULL PARTICULARS ON REVERSE SIDE."* The claimant answered *"NO,"* and therefore the claimant did not "give full particulars" on the reverse side of the form. The claimant began receiving the non-work-related benefits. To continue to receive these non-work-related disability benefits, the claimant filled out this same report form monthly. The claimant filled out this form seven times between October 2010 through May 2011. On each monthly form, the claimant answered "NO," declaring that the injury was not due in any way to her employment. Finally, on July 21, 2011, ten months after the alleged falls occurred and when the non-work-related short-term disability benefits ran out, the claimant changed her mind and changed her answer on the report form and declared "YES," that this injury was due to her employment. The claimant filed a workers' compensation claim, the ALJ awarded benefits, and the Commission affirmed the award. I am convinced that fair-minded persons could not reach that conclusion.



*Discussion*

After returning to work after her unsuccessful claim for social security disability benefits for each of her hands, the claimant was employed by Firestone as a "folder" in the production department. After only two weeks of returning to work, the claimant testified that she suffered three falls at work on September 22, 2010. Generally (she gave at least five different versions of the mechanics of the falls discussed below), she alleged that around 6:00 a.m. she fell and injured her right knee. There was another employee in the area but that employee did not witness the fall. According to the claimant, she could not get back up and was helped by other employees into a wheelchair and taken to the first-aid room. She said that later she tried to get up from the wheelchair to go to the bathroom and when she put her weight on her non-injured left leg, she fell a second time. Dwight Dixon, a supervisor at Firestone, witnessed the second fall and described it as a slow-motion fall in which the claimant landed on her backside, and that her knees did not impact anything. The claimant testified that her left leg remained uninjured after the second fall. After that, the claimant's husband came to pick her up, and while the claimant was walking to the parking lot with the help of Bruce Yelverton, her legs gave out and she fell a third time. According to Dixon, who also witnessed this fall, the claimant went down again in slow motion and slid down the wall on her left side, and again landed on her backside. The claimant alleged that this third fall caused the injury to her left knee.

Within hours of the alleged accident, the claimant was seen by her personal family physician, Dr. Thomas Fox. One would presume that a patient would be objective and



honest in reporting conditions, symptoms, and causation to her treating family physician only hours after the occurrence. She told Dr. Fox that she had taken some leftover hydrocodone (from her previous bilateral carpel tunnel condition), that she was out of her blood-pressure medication, and that *she was sitting on a ramp and stood up. She took two steps and said her knee twisted and gave way. She said she did not trip on anything.*

Dr. Fox ordered x-rays of both knees, which revealed no fractures but identified a small *calcification* in the region of the right quadriceps tendon. MRIs of both knees were performed on October 18, 2010. The MRIs detected tears in the quadriceps tendon of each knee. The quadriceps tendon attaches the quadriceps muscles in the thigh to the patella or knee-cap. The radiology report noted that bilateral tears are often associated with systemic disease including hyperparathyroidism, chronic renal failure, diabetes, rheumatoid arthritis, gout, or with a history of steroid injections. Dr. Mitchell opined that he could not understand why a fall on the right knee would cause the same ruptured tendon on the left knee and he concluded, "At this point, I think she probably has a systemic disease." Dr. Gruenwald, the orthopedic surgeon, stated that in his practice that he sees quadriceps tendon tears at least once a month. However, he further stated that he has seen only three or four cases of *bilateral* quadriceps tendon tears in his twenty years of practice. Dr. Gruenwald also recommended an endocrinology consult to make sure there was no underlying illness predisposing the claimant to these types of injuries. The claimant refused additional testing to determine the nature of the systemic disease on at least three occasions. Dr. Gruenwald performed the surgery to repair the quadriceps tendons on January 7, 2011. The operative report states that

the *"pre-operative diagnosis"* and the *"post-operative diagnosis"* were *"bilateral quadriceps tendon ruptures, chronic."* The operative report also indicates that during the surgery Dr. Gruenwald *debrided scar tissue* from the tendon. All of these notations support a finding of an old chronic injury caused by underlying systemic disease instead of a new acute fresh injury caused by an alleged fall at work.

In addition to the account of the fall she gave to her treating physician, Dr. Fox, within hours of the alleged falls, the claimant gave several other versions of how the falls occurred. First, *"teammate stated. . . . [w]hen she finished, she then proceeded to come out and just as she got to the end of the ramp, she tripped and fell on her right knee."* A second version was given by the claimant to the workers' compensation carrier's representative a day later on September 23, 2010. The claimant stated that she stepped off the ramp, intentionally stepped on a metal bar, and then she *"twisted off balance and down I went."* A third version was given to UAMS and her surgeon two months later on November 24, 2010, and the claimant stated she fell forward *"and hit both of her kneecaps."* Finally, a fourth version was given at the hearing. The claimant testified *"her right foot hit that piece of metal bar"* when she stepped off a ramp and then she *"went off balance and hit the floor landing on her right knee."* The claimant's self-serving testimony at the hearing was inconsistent with her previous versions of the fall.

The claimant had the burden of proving a compensable injury. On review to this court, we will affirm the Commission if there exists substantial evidence to support the Commission's findings. All of the medical evidence in the record indicates that a bilateral quadriceps tendon rupture is highly unusual and typically caused by an underlying medical

condition. The claimant repeatedly refused additional testing to determine the underlying medical condition. The first fall was unwitnessed despite the fact that a co-employee was in the area. The second and third falls were described as slow-motion falls. The claimant told her physician that her knee just gave out and so she applied for, and received, non-work-related short-term disability payments by declaring that her knee injuries were not related to her employment. It was only when the non-work-related short term benefits ran out that the claimant changed her mind and declared the falls were, in fact, work related.

*Conclusion*

On this record I cannot find substantial evidence to support the Commission's award of compensability. Therefore, I would reverse.

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Gail Ponder Gains* and *Larry Watkins*, for appellants.

*Moore, Giles & Matteson, LLP*, by: *Greg Giles*, for appellee.